UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          :
                                  :
          v.                      :    Case No. 2:01-cr-12
                                  :
DONALD FELL,                      :
                                  :
          Defendant-Movant.       :

**Memorandum Opinion and Order**

Donald Fell has moved under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence of death, to vacate and set aside his judgment of conviction and to grant him a new trial.  The Government has opposed the motion, and requested summary dismissal of Fell's claims.  Fell has separately moved for leave to conduct discovery pursuant to the Federal Rules of Civil and Criminal Procedure, and to serve document requests and subpoenas pursuant to those rules.  Following review of the § 2255 motion, the Court orders summary dismissal in part.  The claims regarding juror misconduct and the requests for discovery are addressed in separate decisions.

**I.    Background and Procedural History**

The following narrative is taken from the record and the exhibits and sworn declarations submitted with the motion.

On November 26, 2000, in Rutland, Vermont, Donald Fell and Robert Lee repeatedly knifed Donald's mother Debra and her friend Charles Conway, killing them.  The next morning, Fell and Lee kidnapped Teresca King, a grocery store worker, and stole her

car.  After crossing into New York, they stopped by the road,
accompanied her into the woods and beat her to death.

On November 30, 2000, Fell and Lee were arrested in
Clarksville, Arkansas, driving King's car.  Upon their transfer
to the District of Vermont they were charged with interstate
kidnapping and car-jacking, in violation of 18 U.S.C. § 1201(a)
and 2119.  The Federal Public Defender was appointed to represent
Fell, and attorneys Alexander Bunin and Gene Primomo of the
Albany office of the Federal Public Defender for the Northern
District of New York[1] entered their appearance on December 14,
2000.

On February 1, 2001, a federal grand jury returned a four-
count indictment charging Fell and Lee with car-jacking resulting
in death in violation of 18 U.S.C. § 2119(3) (Count 1);
kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)
(Count 2); brandishing a firearm in furtherance of crimes of
violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 3);
and being fugitives who transported a firearm in interstate
commerce in violation of 18 U.S.C. § 922(g)(2) (Count 4).  Counts
1 and 2 were capital offenses.  Fell and Lee were arraigned on
February 7, 2001.

Under 18 U.S.C. § 3005, a capital defendant has the right to
the appointment of two attorneys, at least one of whom "shall be

---

[1]  At the time, this office covered the District of Vermont.

learned in the law applicable to capital cases." 18 U.S.C. §
3005. The Court must consider the recommendation of the Federal
Public Defender. *Id.* Attorney Bunin sought the appointment.
Letter dated Dec. 11, 2000, Fell Ex. 202.[2] He represented that
he had capital case experience in the state of Texas, and that
attorney Primomo had tried a federal capital case. Hr'g Tr. 10,
June 11, 2002, ECF No. 67. In fact, although Bunin had some
state court capital appellate and habeas experience during the
early 1990s, this was his first capital trial. Primomo's one
capital trial experience dated from 1993 in the Eastern District
of Oklahoma. Fell Ex. 263. After Bunin leaked information
discussed in a sealed hearing concerning a potential plea
agreement to local newspapers, and filed bare-bones motions to
suppress and for change of venue, the Court expressed concerns
about the quality of Fell's defense, and appointed Paul Volk, a
Vermont attorney, to team with Bunin and Primomo. Hr'g Tr. 10-
12; Order of App't, ECF No. 54. Although Volk had extensive
criminal trial experience, he had never been involved in a
capital trial.    From late 2000 through 2001, Fell's defense
attorneys focused on resolving the case with a guilty plea to
life imprisonment without the possibility of release. They had
reason to believe that the United States Attorney's Office for

---

[2] All references to documents submitted with Fell's § 2255 motion are
cited as "Fell Ex. ___."

the District of Vermont would accept such a resolution.  Counsel
hired mental health experts,[3] and retained a mitigation
specialist who undertook a preliminary investigation of Fell's
social history.  In early May 2001, defense counsel received a
report from their expert Dr. Mills, that detailed the results of
a two-day evaluation of Fell.  The evaluation included two hours
of psychological test administration, as well as review of
twenty-four documents concerning his case provided by the
defense.  Dr. Mills concluded that Fell was an alcoholic with
incipient psychosis or pre-psychotic breakdown.  Fell's score on
one of the tests suggested that he was easily dominated,
supporting Fell's claim that Lee was the dominant one of the
pair.  Dr. Mills also concluded that Fell's psychiatric condition
was "overwhelmingly" caused by the biological and environmental
influences to which he had been subjected in his youth, and that
his psychiatric condition was not something he chose.  Fell Ex.
4.  Fell's counsel provided this information and reports from the
other experts to the United States Attorney's Office in May 2001.

     Fell signed an agreement to plead guilty in exchange for
life imprisonment without release on October 24, 2001.  By the
time Fell and the United States Attorney for the District of
Vermont had reached their agreement however, the United States
Department of Justice had determined that all local decisions not

_____

     [3]  Mark J. Mills, M.D., Jonathan Lipman, Ph.D. and Wilfred G. Van Gorp,
Ph.D.

to seek the death penalty in death-eligible cases had to be confirmed by the Attorney General. In January 2002, the Attorney General rejected the plea agreement.

On January 30, 2002, the government filed a Notice of Intent to Seek Death Penalty with respect to Fell.[4] It listed four threshold culpability factors as set forth in 18 U.S.C. § 3591(a)(2)(A)-(D), and three statutory aggravating factors identified in 18 U.S.C. § 3592(c).[5] The notice also listed four non-statutory aggravating factors.[6]

After the government filed its Notice of Intent, the parties negotiated an agreement for the penalty phase to be tried to the Court following a guilty plea to the charges. This option was also rejected by the Attorney General.

In another attempt to resolve the case, the parties agreed to make Fell available to government mental health experts for examination. If those experts believed that there were mitigating factors that would support a guilty plea to life

---

[4] Robert Lee died in a Vermont correctional facility in September 2001.

[5] The three statutory aggravating factors alleged that (1) King's death occurred during the commission of a kidnapping; (2) Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to King; (3) Fell intentionally killed or attempted to kill more than one person in a single criminal episode.

[6] The four non-statutory aggravating factors alleged that (1) Fell participated in King's abduction to facilitate his escape from the area in which he and an accomplice had committed a double murder; (2) Fell participated in King's murder to prevent her from reporting the kidnapping and car-jacking to authorities; (3) Fell participated in King's murder after substantial premeditation to commit the crime of car-jacking; (4) Fell caused loss, injury and harm to King and to her family, including the infliction of distress on King and causing her family extreme emotional suffering.

5

imprisonment without the possibility of release, the parties would jointly argue to the Justice Department that changed circumstances supported a plea bargain to a sentence of life without the possibility of release. The government's experts, Richard Wetzel, Ph.D. and John Rabun, M.D., examined Fell in September and December 2002. They were not permitted to inquire about the murders, Fell's state of mind during the murders or his use of a knife, and they conducted their interviews with defense counsel present. Both experts concluded that there were mitigating facts in Fell's background. *See* Fell Ex. 7, Ex. 8. The parties' request for reconsideration was submitted in February 2005.

Among pre-trial motions filed in mid-2002, Fell moved for a declaration that the Federal Death Penalty Act of 1994 ("FDPA") was unconstitutional. ECF Nos. 44 & 65. On September 24, 2002, the Court held that the FDPA's relaxed evidentiary standard for a jury's finding of eligibility for imposition of the death penalty violated the United States Constitution's Sixth Amendment and Due Process Clause. *United States v. Fell*, 217 F. Supp. 2d 469, 489 (D. Vt. 2002), *vacated* 360 F.3d 135 (2d Cir.), *cert. denied* 543 U.S. 946 (2004). The Government filed an interlocutory appeal on October 22, 2002, and the decision was vacated and remanded on February 3, 2004. *United States v. Fell*, 360 F.3d 135, 146 (2d Cir. 2004). On October 18, 2004, the United States Supreme Court

denied Fell's petition for a writ of certiorari, and the mandate issued October 28, 2004.  ECF No. 73.

On December 1, 2004, Fell filed a Rule 12.2(b)(2) notice of expert evidence of a mental condition indicating his intent to introduce expert evidence bearing on a mental condition should he be convicted of a capital crime.  ECF No. 74.  Upon receipt of the Rule 12.2 notice, the government sought an unrestricted examination of Fell, pursuant to Federal Rule of Criminal Procedure 12.2(c)(1)(B), by its psychiatrist Michael Welner, M.D., whom it had retained in early 2004.

The Court ordered that Fell undergo a complete psychiatric examination, but that the examination be conducted by either or both of the government's original experts, Dr. Rabun or Dr. Wetzel, who had conducted the limited examination of Fell in 2002.  Pursuant to Rule 12.2(c)(2), the results or reports of the examination were to be sealed and not disclosed to attorneys for the defendant or the government unless the jury reached a guilty verdict on one or more of the capital counts and Fell confirmed his intent to offer expert evidence on mental condition during sentencing proceedings.  *See* Fed. R. Crim. P. 12.2(c)(2); Order, Apr. 7, 2005, ECF No. 101.  Prior to any mental health testing the government was to provide to defense counsel a list of any tests its expert wished to perform; the list was not to include more than one test intended to assess the same functions; and the

parties were to reach agreement on the testing or submit the issue to the Court for resolution.  No mental health testing was to be performed by either party until a final decision was reached as to which tests were to be conducted by the government's expert.  *See* Order 2-3.

At a status conference on December 16, 2004, the Court set a trial date of May 3, 2005, with a deadline of January 21, 2005, for the filing of pretrial motions.  Attorney Bunin represented that his mitigation specialist would be unavailable before May, but that the defense would be ready to begin jury selection that month.  Status Conf. Tr. 3-4, ECF No. 255.

Jury selection began on May 4, 2005, with individual voir dire, and continued through June 6, 2005.  Prior to voir dire, prospective jurors completed a lengthy questionnaire.  The jury was selected on June 9, 2005.

The guilt phase of the trial began on June 20, 2005, and ended on June 24, 2005.  In his opening statement, trial counsel admitted that Fell killed Charles Conway, that Lee killed Debra Fell, that they then went out to look for a car, found Teresca King and took her and her car to New York.  He stated that although Fell was still legally intoxicated, the next day he knew what he was doing when "they walked her into the woods, and Donnie Fell pushed her to the ground and he kicked her and Robert Lee kicked her, and Robert Lee picked up a rock and he smashed

her head." Trial Tr. vol. 1, 57:16-19, June 20, 2005. Bunin's rationale was to stress to the jury that Fell admitted responsibility for the crimes, but still to require the government to prove its case. The Court however queried whether Bunin had in fact made a judicial admission to the capital charges. *Id.* at 60-62.

The defense presented no witnesses during the guilt phase and conducted very little cross-examination. On June 24, the jury returned a guilty verdict on all four counts. The penalty phase of the trial began on June 28, 2005, and extended for nine days. Opening its case on July 1, defense counsel told the jury that they would hear expert testimony from Dr. Mark Mills, a medical doctor and psychiatrist, and Dr. Mark Cunningham, a psychologist. Counsel then presented evidence limited to Fell's history before the age of fifteen.[7] Counsel also introduced a "mitigation binder," fifty-one exhibits consisting of more than three hundred pages of documents which included photographs, social services records, police records, hospital and psychological records and educational records. *See* Ex. List, ECF No. 202; Donald Fell Mitigation Binder, ECF No. 301, Ex. 1. Some of the documents were difficult to decipher, several of them highlighted Fell's aggressive behavior toward his mother as a child and some mentioned Fell's apparent lack of remorse when

---

[7] Fell was 20 at the time he committed the offenses.

confronted with the results of his behavior.  Most of the
documents were presented without testimony from penalty-phase
witnesses to place the documents in context.

On July 5, 2005, Fell's counsel received a lengthy report
from Dr. Welner.  The report stated that Dr. Welner had scored
Fell on the PCL-R, a scale for the assessment of psychopathy.
For the scoring, Dr. Welner relied upon behavioral observations
of Dr. Wetzel's videotaped interview of Fell, for which Dr.
Welner provided the questions.  Counsel immediately moved to
exclude Dr. Welner's report and testimony as violating the
Court's April 7 order, among other things.  *See* Mot. in Limine to
Exclude Report & Testimony of Michael Welner, M.D., ECF No. 182.
The Court interpreted the motion as seeking a *Daubert* hearing, as
well as a review of the actions of the government attorneys and
experts, and scheduled a hearing for the following Monday, July
11.  Trial Tr. vol. 8-2, 72-85, July 6, 2005.  During the
discussion concerning the scheduling of the *Daubert* hearing,
trial counsel informed the Court that the defense had not
received discovery with respect to the bases for Dr. Welner's
opinions, including numerous interviews conducted along with the
FBI.  *Id.* at 75-76.  The government indicated that it would
provide the discovery.  *Id.* at 77:3, 84:12-15.

On July 7, before having received or reviewed this
discovery, the defense announced that it would rest without

calling any of its mental health experts, and withdrew its Rule
12.2 notice. Trial Tr. vol. 9-2, 3:9-15, July 7, 2005. The
defense took the position that the government would then be
unable to call Dr. Welner in rebuttal, but the government pointed
out that the defense had introduced evidence concerning Fell's
mental condition through lay witnesses and through documents in
the mitigation binder. *Id.* at 74-75. The Court noted that
whether the government would call Dr. Welner—and the allowable
scope of his testimony—was an open question. *Id.* at 74:22-75:2;
75:12-23. When the Court recessed on July 7, it had not
determined whether the government attorneys or their experts had
violated the Court's April 7 order, and if so whether sanctions
of any sort, including preclusion of testimony, was appropriate.
It had not determined the scope of allowable rebuttal testimony
from the government experts. *Id.* at 75-76.

On July 8, the defense withdrew the mitigating factor that
Fell was under mental and emotional disturbance when the crimes
were committed. The government sought a further stipulation that
Fell was not mentally ill and was not suffering from any
significant mental disorder at the time of the crimes, to which
defense objected.

The Court proposed a stipulation that the defendant did not
suffer from mental illness to the extent that it diminished his
capacity to commit the offenses, and clarified that it would

accept a stipulation that confirmed that the defense was not

raising a diminished capacity defense to the charges, while

leaving open the defense's ability to argue that Fell's

background, including his mental health background, mitigated

against the imposition of the death penalty.  Trial Tr. vol. 10-

1, 58-63, July 8, 2005.  Defense counsel however eventually

agreed that the jury would be read the following stipulation:

> after his arrest in late 2000, Donald Fell was
> subjected to full psychological and psychiatric
> examinations.  Those examinations determined that, one,
> he had no cognitive or neurological deficits; two, his
> intellect and cognitive functions were intact; three,
> he did not suffer from any mental disease or defect.
> The examination also found that Fell was competent to
> stand trial, and knew the difference between right and
> wrong at the time of offenses on November 27th, 2000.

Trial Tr. vol. 11, 93:24-94:8, July 12, 2005.

The defense also sought to exclude any rebuttal evidence

relevant to Fell's teenage years, arguing that because the

defense had not presented such evidence, it was irrelevant.  The

Court disagreed, finding that the years before Fell committed the

crimes were relevant, although it made clear that it would

appropriately balance the probative value and the prejudicial

impact.  Trial Tr. vol. 10-1, 63-66.  The defense rested without

calling its mental health experts, and the government did not

call any mental health experts in rebuttal.

On July 14, 2005, the jury unanimously found that Fell

should receive a sentence of death on the two capital counts.  In

addition to the statutory aggravating factors, the jury
unanimously found that the government proved beyond a reasonable
doubt the following non-statutory aggravating factors: (1) that
Fell participated in the abduction of King to facilitate his
escape from the area in which he and an accomplice had committed
a double murder; (2) that Fell participated in the murder of King
to prevent her from reporting the kidnapping and carjacking to
authorities; (3) that Fell participated in the murder of King
after substantial premeditation to commit the crime of
carjacking; (4) that Fell caused loss, injury and harm to the
victim and the victim's family. Special Verdict Form, ECF No.
200.

Although a substantial number of jurors found that Fell had
demonstrated the existence of factors that would mitigate against
imposition of a sentence of death, no juror found that Fell's
capacity to appreciate his conduct was significantly impaired;
that he did not present a risk to prison officials or other
inmates; or that he had shown remorse for killing King. All of
the jurors found aspects of Fell's background to be mitigating
factors, including his total life experience; childhood physical
and sexual abuse; witnessing family violence; the lack of
positive role models; his treatment and institutionalization for
mental health conditions; that his parents were violent
alcoholics who abandoned him as a child; his longstanding abuse

of alcohol and drugs; and the failure of state social and mental health services to intervene in the abuse and to treat or address his early behavior. *Id.*

Fell filed motions for judgment of acquittal and for new trial, which were denied. On June 16, 2006, the Court imposed a sentence of death, consistent with the jury's verdict.

Fell timely appealed. On June 27, 2008, a panel of the Second Circuit Court of Appeals affirmed the judgment and the sentence. *United States v. Fell*, 531 F.3d 197, 240 (2d Cir. 2008). His request for panel rehearing or rehearing *en banc* was denied. *United States v. Fell*, 571 F.3d 264, 264 (2d Cir. 2009). The judgment became final on March 22, 2010, when the United States Supreme Court denied his petition for writ of certiorari. *Fell v. United States*, 130 S. Ct. 1880 (2010). On March 21, 2011, Fell timely filed this motion for collateral relief pursuant to 28 U.S.C. § 2255.

In his motion, Fell claims that his counsel were constitutionally ineffective in manifold ways, that the government engaged in misconduct before and during trial, and that jury error deprived him of a fair and impartial jury. In addition he claims that the United States Attorney General decided to seek the death penalty against him based on constitutionally impermissible factors, that as an individual who was developmentally a juvenile at the time of his crimes it would

violate the Eighth Amendment to execute him, and that the manner of his execution would violate the Eighth Amendment.  The government argues that all of Fell's claims should be summarily dismissed on the pleading, or at least dramatically reduced.

## II.  Legal Standards

### A.    Federal Collateral Review

Pursuant to 28 U.S.C. § 2255, a federal prisoner in custody may move the court that imposed the sentence to vacate, set aside or correct the sentence on the ground that the conviction and/or sentence violates the United States Constitution.  28 U.S.C. § 2255(a); *see Davis v. United States*, 417 U.S. 333, 343-44 (1974).  Although § 2255 affords a comprehensive remedy to a prisoner who makes a successful challenge, the remedy "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).  Respect for the finality of judgments requires that once a defendant has had an opportunity to present his federal claims through the direct appeal process a court may "presume that he stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 164 (1982).  There is thus a "basic distinction between direct review and collateral review[:] . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* at 165.

Generally, a claim that was litigated on direct appeal

cannot be raised in a § 2255 proceeding.  *See Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir. 1992).  An intervening change in the law may permit collateral review of such a claim, however, *Davis v. United States*, 417 U.S. at 342, although "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  *Teague v. Lane*, 489 U.S. 288, 310 (1989).

"[T]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains."  *Frady*, 456 U.S. at 167-68.  An argument that the legal basis for the claim was not reasonably available to counsel at trial or on appeal may constitute cause for a procedural default.  *Bousley v. United States*, 523 U.S. 614, 622 (1998); *Reed v. Ross*, 468 U.S. 1, 16 (1984).  A prisoner may also obtain collateral relief if he can establish that the constitutional error probably resulted in the conviction of one who is actually innocent, by demonstrating that in light of all the evidence it is more likely than not that no reasonable juror would have convicted him.  *Bousley*, 523 U.S. at 623.  Trial counsel's failure to recognize or raise the factual or legal basis for a claim does not constitute cause for a procedural default, as long as counsel's performance is not constitutionally

ineffective.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

To demonstrate actual prejudice, Fell must show not "merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170.  Where a petitioner claims to be "actually innocent" of the death penalty to which he has been sentenced, excusing a procedurally defaulted claim, he must show by clear and convincing evidence that but for a constitutional error no reasonable juror would have found him eligible for the death penalty under the applicable law.  *See Sawyer v. Whitley*, 505 U.S. 333, 335-36 (1992) (construing a § 2254 petition).

### B.   Rules Governing Section 2255 Proceedings

According to the Rules Governing Section 2255 Proceedings, the court to which the motion is submitted may summarily dismiss the motion "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief."  Section 2255 Rule 4(b); *see Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000).  Summary dismissal may be appropriate if the motion is clearly inadequate on its face, or the record demonstrates that the moving party is entitled to no relief, assuming all the facts alleged in the motion and supporting papers are true.  *See Garcia*

*Montalvo v. United States*, 862 F.32d 425, 427 (2d Cir. 1988) (per curiam); *see also Menzer v. United States*, 200 F.3d 1000, 1005-06 (7th Cir. 2000) (holding that summary dismissal is appropriate where the record conclusively demonstrates that a defendant is entitled to no relief).

To warrant an evidentiary hearing Fell "need establish only that he has a 'plausible' claim . . ., not that 'he will necessarily succeed on the claim.'" *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (quoting *Armienti*, 234 F.3d at 823); *see also Blackledge v. Allison*, 431 U.S. 63, 75-76 (1977) (holding that specific fact allegations, when viewed against the record, warrant summary dismissal only when they are "palpably incredible," or "patently frivolous or false" (internal quotation marks and citation omitted)). To make that determination this Court reviews the claims, the exhibits and relevant portions of the record, taking them in the light most favorable to Fell. If material facts are in dispute, an evidentiary hearing will be scheduled. *See Puglisi*, 586 F.3d at 213 ("If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made."); *accord Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011) ("'[Second Circuit] precedent disapproves of summary dismissal of petitions where factual issues exist[].'") (quoting *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003)).

A movant who survives summary dismissal may be authorized to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure for good cause.[8]  Section 2255 Rule 6(a). Good cause exists "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.'"  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (discussing Rule 6(a) of the Rules Governing Section 2254 Cases); *accord Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003); *Garafola v. United States*, No. 09 Civ. 10280(JGK), ___ F. Supp. 2d ___, 2012 WL 6622684 at *18 (S.D.N.Y. Dec. 20, 2012).  The scope and extent of discovery granted is committed to the discretion of the district court.  *Bracy*, 520 U.S. at 909.

## III. Claims

Fell raises sixteen claims of ineffective assistance of counsel that individually or cumulatively require vacating his convictions and sentence and ordering a new trial; eight claims of prosecutorial misconduct; a claim that he was deprived of his right to an impartial jury in several ways; a claim that the United States Attorney General's decision to seek the death penalty in his case was based on constitutionally impermissible

---

[8]  Rule 12 of the Rules Governing Section 2255 Proceedings provides that both the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure may be applied to a § 2255 proceeding.  Section 2255 Rule 12.

factors; a claim that as an individual who was developmentally a juvenile at the time of his offenses, his execution would violate the Eighth Amendment; and a claim that his manner of execution would violate the Eighth Amendment.

## A. Ineffective Assistance of Counsel Claims

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment's "'right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)). "The benchmark for judging any claim of ineffectiveness [is] whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

In *Strickland*, the United States Supreme Court set forth a two-part test for determining ineffective assistance of counsel, a performance prong and a prejudice prong. *E.g.*, *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). A petitioner (1) "must show that counsel's performance was deficient, so deficient that in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance, and (2) he must show that the deficient performance prejudiced the defense, in the sense that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Matthews v. United States*, 682 F.3d 180, 186 (2d Cir. 2012) (internal quotation marks and citations omitted); *accord Strickland*, 466 U.S. at 687-694.

"Judicial scrutiny of counsel's performance must be highly deferential," and employ a strong "presumption that, under the circumstances, the challenged action or omission might be considered sound trial strategy. *Id.* at 689 (internal quotations marks and citation omitted).

Effective assistance of counsel encompasses a duty to investigate.

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id.* at 690-91. The duty to make a thorough investigation extends to the sentencing phase of a trial. *E.g.*, *Williams v. Taylor*, 529 U.S. 362, 395 (2000).

The procedural default rule does not apply to claims of constitutionally ineffective assistance of counsel. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). In considering a collateral attack based on ineffective assistance of counsel, the

district judge, often the one who presided at trial, "may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance," *id.* at 505, a procedure that allows consideration of the claim on a fully developed record.

### 1. Claim V[9]

The heart of Fell's motion attacks trial counsels' abandonment of their mental health case at sentencing. Specifically, Fell alleges that midway through the penalty phase of his trial, after filing a motion to exclude the testimony of Dr. Welner on *Daubert* and prosecutorial misconduct grounds—and before obtaining discovery, participating in a scheduled hearing or obtaining a ruling—counsel abandoned the motion, withdrew their Rule 12.2 notice, decided not to call any mental health experts, and agreed to a damaging stipulation. They stipulated that Fell had no cognitive or neurological deficits; that his intellect and cognitive functions were intact; that he did not suffer from any mental disease or defect; and that he knew the difference from right and wrong at the time of the offenses. The defense had promised that the jury would hear from their mental health experts. Instead the last piece of evidence the jury received was the stipulation. The government stressed the

---

[9] For ease of reference, the Court refers to the claims by the roman numerals Fell assigned to them in his motion.

stipulation in its summation and rebuttal summation.

Withdrawal of their expert mental health evidence was inconsistent with the defense strategy as presented in their opening statements during the guilt and penalty phases of the trial.

The government contends that trial counsel were making strategic decisions that were neither objectively unreasonable nor prejudicial to Fell's case. From its standpoint, counsel were faced with two very damaging reports by two credible mental health experts, Drs. Wetzel and Welner, and made a reasonable strategic decision to withdraw their mental health case to prevent the jury from hearing their testimony.

The Court finds that, crediting the facts as alleged by Fell, Claim V states a plausible, non-frivolous claim. The Court cannot determine without further development of the facts whether the decision to withdraw the mental health case was a reasonable strategic decision. At a minimum, Fell has proffered that lead counsel Bunin was mistaken in thinking that the Court had already ruled that Dr. Welner could testify. *See* Fell Ex. 264 at ¶ 51; April 24, 2006 Op. & Order 11-12, 23-24 & n.6, ECF No. 236. Fell should have the opportunity to show that this and other factors nullified trial counsels' ability to make an informed strategic decision.

## 2. Claim IV

Fell's motion faults the failure to conduct an adequate investigation into an array of mental health impairments, arguing that the investigation failed to meet prevailing professional norms, missed obvious signs of impairment and essentially ceased once counsel believed they had negotiated a plea agreement.

In December 2004, when the defense issued its Rule 12.2(b) notice, trial counsel had not reviewed the case with any of the doctors they had retained in early 2001 in connection with presenting a mitigation case for negotiating a plea, nor did they ask their experts to conduct more thorough evaluations or update their reports. Dr. Mills, who the defense had indicated would testify at trial, never received a complete social history of Fell, and counsel had only limited discussions concerning his report or expected testimony. *See* Fell Ex. 260. Bunin met Dr. Mills the day he was scheduled to testify.[10]

The government responds that the investigation was reasonably thorough. The neurological, psychological and psychiatric experts who trial counsel retained and with whom they consulted found no significant cognitive impairment or mental health abnormalities. The defense obtained medical records from

---

[10] For trial, defense counsel also retained Dr. Mark D. Cunningham, a forensic psychologist, to testify concerning the effect of Fell's life history and experiences and his family history on his behavior and decision-making, and to his likely positive adjustment to prison. He provided a report in June 2005. *See* Fell Ex. 6.

Fell's psychiatric hospitalizations and information from family members, teachers, social workers, police officers and others to construct a social history.  Although Fell contends that the information provided to his mental health experts was incomplete and inadequate, none of them labeled their findings preliminary or provisional or recommended that the defense supply additional background information.

Claim IV also states a plausible, non-frivolous claim. Whether the mental health investigation was adequate, and whether counsel missed obvious signs of mental impairment, depends on resolution of disputed facts, and cannot be determined without development of the record.

### 3.  Claim III

Fell's motion faults the failure to investigate and present readily available mitigation evidence.[11]  More than four and one half years elapsed between his arrest and his trial.  During part of that time the defense believed it had a plea agreement, and between September 2002 and October 2004 the case was on appeal. From mid-2002, when pretrial motions—including the motion to declare the federal death penalty statute unconstitutional—were

----

[11]  A portion of Fell's Claim XVII also alleges ineffective assistance of counsel for failure to investigate and obtain information from social service agencies, information that was collected by the FBI in its investigation in 2001.  Specifically, the FBI excerpted a psychosocial intake evaluation of Fell conducted in 1994.  According to post-conviction counsel, the full report ("Innocenzi report") contained favorable information, which trial counsel could and should have obtained.  Although that portion of Claim XVII fails to state a claim for prosecutorial misconduct, *see* section III.B.4, the ineffective assistance claim may be considered as part of this claim.

filed, until October 2004 when the mandate returned to this Court, neither Fell's lawyers nor the mitigation specialist did any work to prepare the case for trial. *See* Primomo Decl., Fell Ex. 263; Bunin Decl., Fell Ex. 264; Ayres Decl., Fell Ex. 265.

Fell asserts that the mitigation specialist, at trial counsels' direction, did very little work on his case during this time period. She did some preliminary investigation in the first half of 2001 to provide support for the plea negotiation, but did not complete a social history investigation. *See* Ayres Decl. ¶ 4. By late 2004 and early 2005, the mitigation specialist had limited time to work on Fell's defense, and she was unable to complete a social history investigation for a comprehensive mitigation presentation. *See id.* ¶ 9. She spent very little time with potential witnesses, or with Fell. *See id.* ¶¶ 9-10. She did not oversee the collection of documents such as school and social services records that would be relevant to a mitigation case. *See id.* ¶¶ 11-12.

Fell argues that as a result the defense team failed to obtain readily available social history records, failed to investigate the aggravating factors it expected the government to present, conducted cursory interviews of Fell and his sister, failed to meet and interview other family members or neighborhood witnesses, and failed to obtain a complete social history of their client. Fell's mental health experts received incomplete

information about his background.  At the penalty phase of trial
the defense introduced a "mitigation binder" that consisted of
hundreds of pages of documents, for the most part presented
without context.  The significance of the documents was left to
the jury to determine, essentially without guidance from the
defense witnesses.

The government emphasizes that the defense presented
fourteen witnesses in the penalty phase, who collectively
testified about Fell's childhood in a sufficiently compelling
manner as to persuade the jurors to find unanimously that he was
sexually and physically abused as a child, that his parents were
violent alcoholics who abandoned him, that he was hospitalized
several times for mental health conditions as a child and
teenager, and that he began regularly abusing alcohol and drugs
as a child and continued to do so until the time of his arrest.
Special Verdict Form 13-14.  In addition, a substantial majority
of jurors found that Fell was raised without positive role
models, that he was forced to witness family violence, including
seeing his parents stab each other, and that his total life
experience and the failure of state services to intervene
constituted mitigating factors.  *Id.*; *see also Fell*, 531 F.3d at
230-31 (noting that Fell presented "extensive mitigation
evidence").  That trial counsel did not discover or present
additional mitigating background information was professionally

reasonable, argues the government.

Fell has alleged on the basis of numerous extra-record sworn declarations that the jury heard a superficial, truncated and inaccurate narrative of his life.  He has provided declarations from the defense team that suggest that the failure to conduct a more extensive investigation into Fell's background was not reasonable, and that the failure to present a complete social history to the jury, including his teenage years, was therefore not an informed decision.  Fell has raised factual issues with respect to deficiency, and is entitled to present evidence on this issue.

Deficiency and prejudice may be found where counsel presented a "superficially reasonable" mitigation theory during the penalty phase.  *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (per curiam).  "[C]ounsel's effort to present *some* mitigation evidence [does not] foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."  *Id.*  That inquiry must be "probing and fact-specific."  *Id.*  Given that the Court's task will be to assess the probability of a different outcome at sentencing, it must "'consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence [proffered in the post-conviction proceeding]—and reweig[h] it against the evidence in aggravation.'"  *Id*. (quoting *Porter v. McCollum*, 558 U.S. 30, __,

130 S. Ct. 447, 453-54 (2009) (second alteration in original)).

That task cannot be accomplished at the summary dismissal stage.

### 4.    Claim VI – Ineffective Assistance of Counsel

#### a.    Christopher Eike assault

On February 26, 2002, the government gave notice of its intent to introduce evidence of other crimes, wrongs and acts committed by Fell.  ECF No. 35.  Included in that notice was conduct mentioned by Fell in his interviews with law enforcement between November 30 and December 2, 2000.  In a telephone interview of Fell by New York State Police senior investigator Tom Aiken, Fell stated that he had "caught" a "dude" trying to rape his sister and "put him in a coma for a day."  Fell Ex. 60 at 36.  On the second day of trial FBI Special Agent Jimmie Caudle testified about the statements Fell made during this interview as part of the government's case in chief:

> Fell also advised that, that he had gotten into some
> legal trouble at the most recent Woodstock Festival.
> And there was an incident where, as Fell described it,
> he quote beat the shit unquote or end quote out of an
> individual who he said was trying to rape his sister.
> Lee advised that he put the guy in a coma for about a
> day and that charges were eventually dropped against
> Mr. Fell.

Trial Tr. vol. 1, 6:17-7:1, June 21, 2005.  In addition a tape recording of this statement was played to the jury.  *Id.* at 36.

Prior to trial, Fell moved in limine to exclude evidence of prior acts and to require the government to make a specific proffer describing the testimony.  ECF No. 93.  The government's

proffer in opposition did not mention this incident as one of the acts it intended to introduce.  ECF No. 112.  The Court denied Fell's motion without prejudice, suggesting that Fell move to exclude specific acts to which he objected.  No further motion was filed on this issue, nor did trial counsel move to redact the transcript of Fell's interview, nor did trial counsel object to the testimony by Agent Caudle.

In the penalty phase of trial, the defense called Fell's sister, Teri Fell.  On cross-examination the government asked Teri about the incident.

```
Q    Was there a time when you also saw your brother be
     very angry and use his feet?
A    . . . I'm not sure what you are referring to?
Q    Did you ever see him kick someone violently?
A    Yes.
Q    What did you see him do?
A    He beat a kid up and he was kicking him.
Q    How serious was it?
A    It was pretty serious.
Q    Did the kid go into shock and into a coma?
A    Yes, he did.
          *     *     *
Q    And in terms of what your brother did to this
     person, did he do anything other than stomp on the
     person?
A    He punched him.
Q    Did he urinate on him?
A    Yes.
```

Trial Tr. vol. 7-1, 146:15-25; 153:13-18, July 1, 2005.  On redirect, the defense elicited that she and her brother were among a group of young people who were doing drugs at the festival the summer before Fell came to Vermont.  One of them, Christopher Eike, was grabbing her and trying to kiss her and she

told him to stop or she'd have her brother beat him up.  He did

not stop; Fell asked him to stop; Eike punched Fell and Fell and

others beat Eike, and hurt him, as Teri put it, "very badly."

*Id.* at 157:25.  The redirect examination then focused on Fell's

acceptance of responsibility for the assault.  On re-cross, the

government asked again about the assault:

```
Q    And what did they specifically do?
A    They punched him and kicked him, and then Donnie
     urinated on him, and then covered him up with a
     shirt because he was wet.
          *    *    *
Q    How many times did they kick him?
A    I don't know.
Q    Was he unconscious at one point?
A    At the end he was unconscious.
Q    How many times do you think they kicked him until
     he became unconscious?
A    I don't know.
          *    *    *
Q    Was it clear that the person was defenseless?
A    Yes.
Q    And he kept kicking him?
A    Yes.
Q    Now, he began to shake, right, on the ground
     because of the shock?
A    Yes.
Q    And so at that point, he was unconscious and
     trembling on the ground?
A    Um hum.
Q    And your brother urinated on him?
A    Yes.
```

*Id*. 161:1-162:13.

     In summation the government pointed out the similarities

between the two assaults that occurred

     just a few months before the crimes in this case.  What
     did she tell you? Donald Fell committed a horrible,
     violent assault on a person the same way he then later
     killed Terry King.  He did it intentionally.  He did it

31

violently.  And he did it with the utter depravity that
        you have heard about in this case.  He did it in that
        case.  Remember what he did after he beat that man with
        his feet into a coma.

Trial Tr. vol. 12, 60:12-19, July 13, 2005.  In rebuttal, the

government reiterated:  "It wasn't enough for him, in New York,

in August 2000, to knock that guy down and to stomp him into a

coma.  Then he urinated on him as the guy lay convulsed."  *Id.*

124:5-7.

        In addition to Fell's post-arrest statements, the government

provided trial counsel with a copy of the New York state police

incident report and statements taken from Fell and Lee by the

Sullivan County Sheriff's Department, as well as statements from

Lee's brother and an additional witness.  Counsel also received,

prior to trial, a copy of the FBI's report of its interview with

Eike on June 15, 2005 at a state correctional facility in

Pennsylvania.  Eike confirmed that the group were high.  He

stated that Fell punched him in the face, Eike fell, Fell punched

him repeatedly in the face and slammed his head against the

floor.  Fell urinated on Eike's leg and kicked him in the head

and ribs.  Eike passed out and regained consciousness in an

ambulance.  Fell Ex. 129.  Counsel did not receive a copy of

Eike's criminal history, nor apparently was one requested.

        The defense team did not attempt to interview Eike, or any

of the others present during the incident, with the exception of

Teri Fell.  The team did not attempt to explore the extent of

Eike's injuries or whether the comments about him being in a coma were true. According to information obtained by post-conviction counsel, Eike's injuries were significantly over-reported: he was treated for shock at the scene, and transported to a local hospital where he was treated for a scalp contusion and knee pain and released. *See* Fell Ex. 56, 286. There was evidence that Eike had been briefly unconscious; there was no evidence that Eike had ever been in a coma.

Fell claims that trial counsel were ineffective for failing to investigate an allegation that counsel were on notice that the government would attempt to use, both as 404(b) material in the guilt phase and as an aggravating factor in the penalty phase.

The government argues that an attempt to portray Eike's injuries as minor would have been inconsistent with the defense strategy to portray Fell as accepting responsibility for his actions. The trouble with its argument at this stage of the proceedings is that it is not clear whether such a strategy was the product of informed decision-making, given the apparent failure to investigate the incident. For purposes of withstanding summary dismissal, Fell has adequately pled that counsel were ineffective for failing to investigate and to counter the Eike assault allegation.

### b. Gacek shooting

Fell also mentioned in his statements to law enforcement on

33

December 2, 2000, that when he was a child he accidentally shot his friend John Gacek in the shoulder.  Fell Ex. 62.  Defense counsel were on notice as of February 26, 2002, that the government intended to introduce evidence of other acts that Fell mentioned in his interviews.  ECF No. 35.  In his pretrial motion in limine Fell sought to require the government to specify which acts it intended to introduce.  ECF No. 93.  The government responded with seven specific acts, none of which were the Gacek incident, but also stated that it expected to offer Fell's confessions at trial, which did include mention of the Gacek shooting.  As with the Eike incident, Fell made no further attempt to preclude mention of the Gacek shooting at trial.  The government introduced Fell's statements to law enforcement as part of its guilt-phase case in chief.

In its penalty-phase opening statement, the government stated

> that Donald Fell's pattern of uncontrollable behavior
> began to take a turn for the worse when he was about 11
> years old, and between the ages of 11 and 13, his
> behavior led to several admissions in psychiatric
> hospitals. . . . In April 1992 he was institutionalized
> after shooting a boy with a nine millimeter pistol,
> barely missing his heart.  This was the episode you
> heard him describe in one of his taped admissions when
> he said that the boy jumped in front of the bullet.
> Hospital records from the time state that Fell, quote,
> shows no remorse, and threatens to shoot his mother,
> close quote.  After more counseling sessions with
> doctors, family and healthcare providers, Fell was
> released after he expressed remorse and apologized to
> his mother.

Trial Tr. vol. 5-1, 39:8-40:9, June 28, 2005.

Fell's mitigation binder included records from the Wilkes-Barre General Hospital from April 1992 where he was referred at age eleven, three days after the shooting. The records summarized the incident: "Three days ago, Donald and his friend were playing with a 9 mm. police handgun which belonged to the other boy's father. The gun went off while Donald was holding it and the other boy was hit in the shoulder." Mitigation Binder, Ex. 25.

The records also refer to other complaints of violent behavior toward others, and document that although at first Fell bragged about the shooting and was "oppositional" and "defiant", after some time in the hospital with counseling and adjustment of medications he "seemed to greatly regret the incident" and "[a]t the time of discharge . . . showed genuine remorse for shooting his friend." *Id.*

In cross-examining Fell's social worker, Deanna German, however, the government showed her and quoted a hospital record from the following year that summarized Fell's past history as having "'accidentally' shot a boy in the chest with a handgun."

In its penalty-phase summation, the government stated again:

> what happened was there was a new problem within [the Fell] family. That was Donald Fell. He became violent. He began to make choices about keeping knives in his room, about throwing things at other people, at stabbing one of Teri Fell's friends, of unfortunately, almost tragically, shooting one of his friends. That's

35

the beginning of Donald Fell. And that's the first
glimpse we have of the Donald Fell that we now have
today, and who he became.

Trial Tr. vol. 12, 56:8-16, July 13, 2005. Returning to its

theme, the government stated:

Why is [Fell] being sent to the [psychiatric] hospital?
He is being sent to the hospital because he's violent.
And the violence is extreme. The violence is him
keeping knives. The violence is anger towards his
mother. Threats towards his mother. Throwing things
at his mother. Throwing knives at his mother. Danger
to his sister. Picking up a weapon. He claims,
accidentally, shooting another child.

*Id.* at 58:20-59:3.

Fell claims that trial counsel were ineffective for failing

to investigate the circumstances of the shooting. There were

several available witnesses who would have confirmed that the

incident was an accident. None were interviewed by the defense

team. Fell's friend John Gacek would have testified that he was

showing off his father's gun, and that "[i]t was a stupid

mistake, and I still feel that it was my fault." John Gacek

Decl., Fell Ex. 251. Gacek's mother would have testified that

"[i]mmediately after the accident, Donny was upset and scared.

John spent the night in the hospital, and Donny came to see him

at our house the next day. Donny ran over to John and put his

arms around him, and they both started to cry. They held on to

each other for a long time." Adele Gacek Decl., Fell Ex. 252.

Gacek's stepfather would have testified that after the accident

Donny was scared and worried about John, who was his

best friend.  Donny felt terrible about what happened.
After John got home from the hospital, Donny came over
to see him.  Donny was very upset and remorseful.  John
and Donny were hanging on each other like two little
girls, both crying.  They kept saying, "You're still my
friend.  You're still my friend."  We knew that Donny
felt bad about what happened.

Schuldaski Decl., Fell Ex. 253.

The government argues that the testimony of these witnesses
would not have added to the information that the defense already
had, from Fell himself and from the hospital records, but merely
offered a different point of view.  From the hospital records and
Fell's statements, the government repeatedly indicated to the
jury its skepticism that the shooting was accidental or that Fell
felt remorse for his conduct.  The Gacek family's different point
of view is exactly what Fell argues was essential to persuade the
jury that the shooting was accidental and his remorse genuine.

Although taken alone, the failure to investigate the Gacek
shooting incident further might not constitute ineffective
assistance of counsel, where Fell is arguing that multiple
instances of failure to investigate cumulatively amounted to
ineffective assistance, summary disposal of the allegation is not
warranted.

### 5.   **Claim VII – Ineffective Assistance of Counsel**

During the penalty phase, the defense presented evidence to
support the mitigating factors that (1) Fell did not present a
risk to prison officials or other inmates if he was sentenced to

life in prison without possibility of release (Mitigation Factor 5), and (2) Fell had made positive contributions to the correctional facility by working, gaining an education and helping to resolve inmate grievances (Mitigation Factor 6).

In rebuttal, the government submitted Fell's disciplinary record and two videotapes of incidents in which Fell failed to comply with commands and showed aggressive behavior to correctional officers. A videotape of an incident on March 17, 2004, depicted Fell being verbally aggressive and eventually spitting at a correctional officer named Marc Pelkey.

According to Fell's motion, trial counsel knew about the March 17 incident as early as February 2005, including the name of the officer. On May 18, counsel was informed that the government might call Officer Pelkey as a witness. Counsel did not request the disciplinary or grievance records of any of the officers involved. Had counsel investigated, they would have learned that Pelkey had a record of using excessive force against inmates, that he had been required to attend anger management classes and that he had been investigated for using excessive force following the March 17 incident with Fell. Fell Ex. 256.

The government used the prison incident evidence to argue against according Fell's Mitigating Factors 5 and 6 any weight, contending that "the violations have increased," "they have gotten more serious," and "it's getting worse." Trial Tr. vol.

12, 46:22-3; 47:2, July 13, 2005.  Further:  "Maturing in prison?
You saw him on those videotapes;" "Donald Fell's going to be a
problem in prison.  And that should be obvious to everyone."  *Id.*
at 47:11-12; 48:4-5.

In its cross-examination of Fell's case worker at the
correctional facility, the government elicited testimony
regarding Fell's involvement in religious activities of a variety
of different faiths, including participation in Christian Bible
studies, fasting for Ramadan, and Native American rituals.  The
case worker also testified that Fell had filed grievances and a
lawsuit requesting Native American services at the facility.  The
implication was that Fell's interest was insincere and
manipulative, and that he was a troublemaker.  The government
stressed this in its summation:

> Let's get real. . . . What positive contributions has
> this man made to the Northwest Correctional Facility? .
> . . They want to claim that he is a positive
> contribution in resolving grievances?  You heard from
> Jason Rushlow.  The man generated grievances.  Are you
> kidding me?  You saw the lawsuit. . . . This man signs
> up for bible study, and then files a lawsuit claiming
> to be . . . a native American.  He files a lawsuit so
> that he can practice his Native American religion on
> the yard.  It's bogus, ladies and gentlemen.  You know
> it's even more bogus because, believe it or not, he
> observes Ramadan as a Muslim.

*Id.* at 48:13-49:4.

Present in the courtroom for much of the trial was Deacon
Steve Ratte.  According to his declaration, he would have been
able to present this information accurately and in a positive

light.  Deacon Ratte is a member of the Catholic church who has
ministered to inmates at the correctional facility for twenty-
eight years.  He began meeting regularly with Fell for several
years before his trial.  Deacon Ratte would have testified that
Fell took his involvement with religious services very seriously
and was interested in learning about other religions, that he was
intellectually curious and wanted to be involved in many of the
limited activities that the facility offered, including exploring
other religions and thinking critically about them.  Fell Ex.
255.  He could have provided additional positive information
about Fell's interactions with other inmates.

Trial counsel did not seek to have Deacon Ratte testify.  He
was willing to.  They never met with him to learn what evidence
he could provide.  According to Fell, Ratte's testimony would
have countered the suggestion that his participation in a variety
of religious activities was an insincere and cynical
manipulation, and would have offered a positive view of Fell's
behavior in a prison environment.

The government contends that it was reasonable not to call
Deacon Ratte, and that even if it was error Fell cannot show
prejudice.  Where, as here, Fell argues that collectively trial
counsels' errors were prejudicial, he has adequately alleged
ineffective assistance in the failure to investigate and present
available evidence to mitigate or counter the government's case

against according any weight to mitigation factors 5 and 6.

### 6.    Claim VIII – Ineffective Assistance of Counsel

#### a.    Evidence regarding co-defendant Robert Lee

Fell claims that trial counsel were constitutionally
ineffective in failing to investigate Robert Lee and failing to
interview a witness who claimed to have seen Lee, Fell and
Teresca King by the road near where she was killed.  He argues
that the jury was deprived of information that would demonstrate
that Lee was the more culpable of the pair, in contrast to the
government's portrayal of Lee as less aggressive and a follower.

At an early point in their representation of Fell, trial
counsel successfully moved to prevent any evidence of Fell's
relationship with his co-defendant Lee from reaching the jury.
Government mental health experts were not permitted to question
Fell about his relationship with Lee.  Lee's post-arrest
statements were excluded from trial.  Several letters written by
Lee from jail were also excluded.  These letters and statements
suggested that Fell, not Lee, was the leader and instigator of
the crimes.

Trial counsel also was in possession of information that
suggested that Lee had instigated the death of King:  Fell's
post-arrest statements, and a preliminary mental health
evaluation of Fell that concluded that he was easily dominated by

others.  Mills Report, Fell Ex. 3 at 5.[12]  Trial counsel were on
notice that Lee was a disturbed individual, information that
included the circumstances of Lee's death on September 20, 2001.

Trial counsel did not request or receive discovery from the
government concerning Lee, nor did they ask their mental health
experts to examine the relationship between Fell and Lee, nor did
they conduct their own investigation into the relationship
between the two.  *See, e.g.*, Primomo Decl. ¶ 11, Fell Ex. 263;
Bunin Decl. ¶ 38, Fell Ex. 264.

In its guilt-phase summation the government stressed that
although Fell admitted the basic facts of the crimes, he "la[id]
off a lot of the responsibility on Bobby Lee."  Trial Tr. vol. 4-
1, 51:22-23, June 24, 2005; *see also id.* 65:13-15.  Near the
close of its argument, the government stated: "And if there was
any more doubt about the dominance of Donald Fell in the Lee-Fell
relationship listen to what he said when the police officer asked
him on tape what he would have done at the Price Chopper if Lee
had tried to stop him from car jacking Terry King."  *Id.* 71:22-
72:2.  It then played the tape recording of Fell boasting that if

_____

[12]  Dr. Mills observed:
Drs. van Gorp and Walton directed my attention to Mr. Fell's very
low score on the MMPI-2 Dominance Scale.  This score tends to
confirm Mr. Fell's statements that he had not intended to hurt
Mrs. King, that he had intended to release her, but that he
acceded to the demand of Mr. Lee that she be killed because she
knew their identities.  In effect, his score means that Mr. Fell
is incapable of standing up for his beliefs and that others can
easily dominate him.
Mills Report, May 7, 2001, at 5, Fell Ex. 3.

Bobby had held the shotgun on him "I would have stuck it up his ass." Fell Ex. 62 at 29.

At the outset of the penalty phase of the trial, the defense had alleged as a mitigating factor that "Donald Fell would not have committed the crimes without the influence of Robert Lee." Trial Tr. vol. 11, 16:9-11, July 12, 2005. Trial counsel avoided presenting any evidence about Lee or his relationship with Fell. At rebuttal, the Court ruled that the government could present evidence that Fell was the leader of the two, but could not present evidence concerning Lee's character, because none had been introduced by the defense. *Id.* at 16-17. The government moved to strike the mitigator, and trial counsel moved to amend the mitigator to state that Donald Fell and Robert Lee acted in concert in committing the crimes (Mitigating Factor 10). The Court accepted the amendment.

In rebuttal, the government presented the testimony of a childhood friend of Fell and Lee who testified that Fell was a leader and agreed that Lee the quietest and least violent of the group. *Id.* at 46:12-47:5.

The government argues in favor of summary dismissal that presenting no evidence to the jury concerning Fell's relationship with Lee was an informed strategic decision, based on trial counsels' concern that this would open the door to damaging evidence in rebuttal. Without discovery and further development

of the record, however, it is not possible to determine that the decision not to present evidence of Lee's character or relationship with Fell, if strategic, was an informed and reasonable one.

### b. Evidence regarding Francis Bellantoni

Francis Bellantoni supplied a statement to the New York state police on December 12, 2000, in which he described seeing a car by the side of state highway 22 in Dover Plains, New York, on his way to work. He noticed the car had Vermont license plates, that two men outside the car were apparently arguing, and that a woman was sitting in the back seat of the car. After he had passed the car he returned to retrieve his cell phone which he had left at home. He passed the car again, and this time he noticed that the woman was walking towards the woods, with the two men about eight to ten feet behind her. When he passed by again on his way to work, the car and the people were gone. *See* Bellantoni statement, Fell Ex. 68. Bellantoni's statement was provided to the defense. The defense did not interview him.

Had the defense interviewed Bellantoni, they would have learned the following additional information. Although Bellantoni could not identify either man, he observed that one was yelling at the other, and that the second time he observed the pair, the one who had been yelled at was trailing behind the other as the three individuals approached the woods. *See* Fell

44

Ex. 301.  Fell argues that this information provides critical evidence to support the defense theory that Fell and Lee were arguing because Lee was in favor of killing King while Fell wanted to let her go.  *See* December 1, 2000 Fell statement, Fell Ex. 60.

The government argues that even assuming that the three individuals were Fell, Lee and Terry King, and that Bellantoni—traveling in his car at speed on the highway—made accurate observations, there is no way of knowing which man was the apparent aggressor.  Trial counsel used the Bellantoni evidence in opening:  "a passing motorist saw [Fell and Lee] arguing by the side of the road."  Trial Tr. vol. 1, 57:12-14, June 20, 2005.  Conducting further investigation of this witness would not, it contends, have supported the defense theory that Lee was the aggressor.

The argument that the failure to investigate was sound strategy cannot be resolved on summary dismissal.  Trial counsel emphasized Fell's hesitation over killing King and that Fell and Lee disagreed about whether to do so.  Yet the only evidence before the jury on this point was the arguably self-serving statements of Fell upon his arrest.  Bellantoni's observations corroborated Fell's statements.  `The issue is not whether the jury would have credited Bellantoni's testimony had the defense called him, but whether trial counsel made an informed decision

not to interview the witness at all.

### 7. Claim IX

Fell claims that his trial counsels' failure to conduct an adequate forensic investigation constituted ineffective assistance of counsel. From the outset of the case trial counsel pursued a strategy of acceptance of responsibility. As a consequence they conducted no forensic investigation into the relative roles of Fell and Lee in the death of Teresca King. They were unable to present any forensic support for their contention that Fell would not have committed the crimes but for the influence of Robert Lee, a contention that was modified during the penalty phase of trial to assert that the two acted in concert.

The government consistently portrayed Fell as a leader and Lee as quiet and less violent. More significantly, the forensic pathologist who conducted King's autopsy, Dr. Michael M. Baden, indicated in his autopsy report and in testimony at trial that King died as a result of both the blows to her face and consequent brain injury, and the compression of her neck with asphyxia. *See* Autopsy Report, Fell Ex. 65; Trial Tr. vol. 5-1, 89-90, June 28, 2005. Dr. Baden gave his opinion that a rock wielded by one of her assailants caused extensive skull fractures and brain injury, and the neck injury was consistent with having been stomped by a boot. *Id.* at 83, 86-88.

From Fell's statements to police the defense had information that Lee had hit King with a rock and that Fell had used his feet. Fell Interview Dec. 1, 2000 at 22, Fell Ex. 60. Fell has submitted a report from Dr. Charles V. Wetli, a board-certified forensic pathologist and former chief medical examiner, who reviewed the autopsy report and concluded that there was no evidence of asphyxiation, and that the damage to King's brain from the injury caused by the rock would have resulted in immediate loss of consciousness. In his opinion the "stomping and kicking did not inflict any lethal injuries," and the sole cause of death was "blunt craniocerebral trauma." Wetli Report, Fell Ex. 306.

In capital cases a defendant's "punishment must be tailored to his personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). A sentence of death "may not be imposed unless the sentencer has examined the defendant's 'own personal involvement in the crimes.'" *United States v. Webster*, 162 F.3d 308, 322 (5th Cir. 1998) (quoting *Tison v. Arizona*, 481 U.S. 137, 158 (1987)). Section 3591(a)(2)(A)-(D) of Title 18 United States Code requires a jury to find one of four "gateway" mental intent factors beyond a reasonable doubt before it may consider whether a sentence of death is justified.[13] In Fell's

_____

[13] Those factors are that the defendant:
(A) intentionally killed the victim;
(B) intentionally inflicted serious bodily injury that resulted in

47

case the jury unanimously found that the government had proven all four factors beyond a reasonable doubt.  Special Verdict Form, ECF No. 200.

Fell claims that trial counsels' failure to investigate the forensic evidence deprived him of the argument that he was not death-eligible because his actions did not directly result in King's death.  The government takes issue with some of Dr. Wetli's conclusions, and the significance that Fell would place on those conclusions.  More importantly, it argues that even if Dr. Wetli's testimony would have supported a challenge to the first two intent factors, Fell would still have been death-eligible under the last two intent factors.  These factors apply if Fell participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, or if he intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death, and the victim died as a direct result of the act.  18 U.S.C. § 3591(a)(2)(C), (D).

---

the death of the victim;
(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
(D) intentionally and specifically engaged in a act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.
18 U.S.C. § 3591(a)(2).

The challenge to the forensic evidence is relevant to all four factors, however. The "act" in the case of factor C and the "act of violence" in the case of factor D must directly result in the victim's death. Armed with this forensic evidence, counsel could have argued that it was Lee whose actions directly resulted in Teresca King's death, and that she was not "killed twice."

Dr. Wetli's report does not of course establish that Dr. Baden's conclusions were invalid or unsupported, or that Fell was ineligible for the death penalty. Fell's claim is that trial counsel unreasonably failed to conduct a forensic investigation that might have clarified his and Lee's respective roles in a situation where a jury was required to make an individualized determination of Fell's intent in order to find him eligible for the death penalty. Instead, counsel accepted uncritically and argued to the jury that Fell "was directly responsible . . . for at least one of the causes of death of Mrs. King." Trial Tr. vol. 12, 79:22-24, July 13, 2005. Summary dismissal of this claim is not warranted.

### 8. Claim X

The government alleged as a statutory aggravator that Fell "committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Teresca King." Superseding Indictment, ECF No. 57. In its penalty-phase opening statement, the government stated: "[Y]ou

will learn that as Terry lay on her back in Dover, her head was kicked so savagely that teeth were knocked out, later found on both sides of her body.  One of her earrings was found several feet away.  You will hear that her throat was crushed by a boot pressing down on her neck with about 150 pounds or more of pressure."  Trial Tr. vol. 5-1, 36:12-18, June 28, 2005.  The evidence established that an earring, and the post for that earring, were found approximately three to four feet from King's head, around her mid-thigh.  Two teeth were recovered, one to the left of her body by her left forearm, and one above and to the right side of her head.  *Id.* at 64-65.

Dr. Baden testified that King's body had been lying where it was found for a number of days.  There was evidence of blunt force injury to her head and fractures of skull and jaw bones. There was also evidence of injury to her neck: fractures of her right collar bone and extensive damage to the windpipe and Adam's apple.  *Id.* at 80, 82-83.  Dr. Baden opined that "[t]he pressure on the neck . . . indicated severe compression of the neck by a powerful force. . . . [T]hese injuries were much more extensive than what we would see in a hand compression of the neck."  *Id.* at 83:16-21.

The government drew Dr. Baden's attention to Fell's and Lee's boots, and he opined that a boot of that type would cause the injuries he observed to the neck area, "And that could all be

done with one forceful blow, one forceful – when I say stomp, a real hard impact with the type of boot that I examined." *Id.* at 87:19-25. The government asked "about how many pounds of pressure were required to do that." *Id.* at 88:25-90:1. Dr. Baden responded:

> You need more – more than – more than 150 pounds of pressure; from various informations we have from examining dead bodies, that just leaning on the neck wouldn't be enough. There would have to be a forceful application of at least 150 pounds of pressure, because normally, for example, normally we see people hang themselves, and when people hang themselves, there's no fractures. Even though the person may weigh 200 pounds, and the head weighs about 12 pounds, so there's 190 pounds of pressure, it doesn't cause a fracture, but if that same amount of force were brought down with – that's why I use the term stomp – with a force, then that would cause a fracture. But not just the pressure itself. It's the focal, sudden application of that pressure.

*Id.* at 89:2-16.

Dr. Baden concluded that King died from the blows to her head and the injuries to her brain, and the injuries to her neck:

> . . . I think in the combination of both, I think most of the injuries, she was still alive, alive from the point of view of the heart's still beating. Unconscious most probably from the first blows to the face, but that there was kind of an overkill. There were many more injuries that were produced, caused, than would have been necessary for her to die.

*Id.* at 90:7-13.

On cross-examination, defense counsel established that it was impossible to tell which boot caused the injuries, and that an individual intent on killing might not have known that he was

51

inflicting more injury than necessary to kill. *Id.* at 91, 94.

In its opposition to the defense's motion for judgment on this aggravating factor, the government stressed Dr. Baden's testimony describing King's injuries as "overkill," and that King's neck sustained injury consistent with 150 pounds of pressure being exerted, noting that neither assailant weighed more than 135 pounds, and contending that one of them jumped on her. *See* Trial Tr. vol. 6, 73-74, June 29, 2005. It also emphasized the location of teeth and the earring at the crime scene, indicating "gratuitous additional injuries" and "violence or a struggle above and beyond the lethal blows." *Id.* at 75:11-17.

The Court denied the motion for judgment, noting among other things, "separate impact injuries to [King's] mouth and jaw, sufficient to dislodge two of her teeth" which were recovered on opposite sides of her body. Mem. & Order 2, ECF No. 173.

In summation the government reminded the jury that one tooth was found on one side of King's body, and one tooth on the other, and argued: "What does that mean? That means that there were separate blows one way, and then another [blow] the other way. They were so powerful that her teeth came out of her mouth whole. But those blows did not kill her." Trial Tr. vol. 12, 23:7-11, July 13, 2005.

The government argued further:

You remember the testimony. The earring and post were found even further from her body. What does that mean? That means either that the assault of Terry King began when she was standing up several feet from where she was found, and they were hitting her so hard that it literally was torn off, or that this was part of the further stomping in this case by the defendant, where again, she was hit so hard that earring was literally driven off the side of her head.

*Id.* at 23:19-24:2. Finally in support of this statutory aggravating factor the government argued that King was "actually killed twice," that "[i]n Dr. Baden's opinion, this was overkill," and that she was "killed multiple times." *Id.* at 24:21-22; 25:14.

Fell submits that trial counsel were ineffective for failing to investigate and challenge the forensic evidence. The autopsy report indicated that King's "right earlobe [was] largely absent due to . . . animal activity." Fell Ex. 65. Despite this indication that the earring, if belonging to King, might have been transported away from her body by an animal, counsel did not challenge the evidence or the inference that the earring had been knocked from her head by the blows she sustained. Fell's expert Dr. Wetli has opined that the displaced earring and teeth were the result of animal activity and not the result of blunt force trauma. Wetli Report, Fell Ex. 306.

Fell also argues that trial counsel were ineffective for failing to challenge the scientific basis for the government's contention that 150 pounds of force were applied by a boot to

53

crush King's neck, and failing to challenge the scientific basis for the government's contention that she was killed more than once. Fell's expert Dr. Wetli is of the opinion, to a degree of reasonable medical certainty, that there is no basis for the conclusion that 150 pounds of pressure were applied to Mrs. King's neck, that there were no signs of asphyxia, and that the sole cause of death was blunt force trauma to the head. *Id.*

Fell has adequately pled that trial counsels' failure to obtain a forensic pathologist's review or otherwise to investigate the facts upon which they knew the government would rely to prove the statutory aggravator of serious physical abuse was constitutionally deficient.

### 9. **Claim XI**

Fell claims that his trial counsel were ineffective for failing to conduct a forensic or fact investigation into the deaths of Debra Fell and Charles Conway. Trial counsel apparently did not request or were not provided with complete discovery concerning the Rutland homicides, and the Rutland City Police Department has refused to provide access to certain documents and physical evidence to post-conviction counsel. The government protests that Fell's claim of ineffective assistance for failure to uncover exculpatory forensic evidence is therefore speculative and fails to state a claim.

It is the alleged failure to obtain complete discovery from

the Rutland crime scene and to subject it to forensic analysis
that forms the basis for Fell's claim.  The deaths of Debra Fell
and Charles Conway were obviously critical elements of the
government's case.  The government alleged a statutory and a non-
statutory aggravating factor in connection with their killing.[14]
*See* Notice of Intent to Seek Death Penalty 3 at II.3; III.1, ECF
No. 32.  Although Fell confessed to his role in their deaths and
related various details of the crimes, he also admitted to having
consumed alcohol and crack cocaine, and he repeatedly stated that
he didn't know or couldn't remember what precipitated the events.

> Q:  What happened originally at the house that started
>     all this?
> A:  Ah, really, I, really don't know.  Its its ah.
> Q:  You had a long standing argument with your mom?
> A:  No, we were, none of us were arguing.  That was
>     ah, it just happened.  I don't know ah.
> Q:  What made you get mad all of the sudden this
>     morning?
> A:  I really don't know.

Fell Interview Dec. 1, 2000 at 34-35, Fell Ex. 61.

> Q:  Can you kind of explain to me what happened prior
>     to you and Bobby leaving Vermont?
> A:  Well what happened was, is we were all kind of
>     wasted, you know pretty fucked up.  My mom was
>     [pretty well] [we were all][15] smoking crack and
>     you know drinking lots of alcohol and shit.  To
>     tell you the truth I don't really know what

---

[14]  Those factors were that "[t]he defendant intentionally killed or
attempted to kill more than one person in a single criminal episode; and
"Donald Fell participated in the abduction of Teresca King to facilitate his
escape from the area in which he and an accomplice had committed a double
murder."  *See* 18 U.S.C. § 3592(c)(16); § 3593(a)(2).

[15]  The first bracketed phrase appears in Fell's Exhibit 62.  The second
bracketed phrase appears in the government's brief at page 260.

```
            happened to lead up to what happened; you know
            what I mean.
            *         *          *
    Q:      Do you, do you know what caused you to do that to
            Charlie?
    A:      I have no idea.  I have no, you know I was getting
            along with him, we weren't mad and nobody was
            fighting or arguing we were all having a good
            time.
            *         *          *
    Q:      . . . [W]hat was going on just before you grabbed
            that knife?
    A:      The way I've been looking at this I was sitting
            there drinking playing our card game, the radio
            was on, classic rock was playing on the Foxx.  I
            don't know I remember getting up and picking the
            knife up, I don't remember my way through the
            hallway, I don't really remember the first cut,
            but I remember the rest of the stabs.
    Q:      But backing up just before you grabbed the knife,
            what were you saying to Bobby or what was Bobby
            saying to you?
    A:      I don't know really the stage but really laughing
            and having a good time playing cards, getting
            drunk I know we were already drunk but just
            getting more you know.
            *         *          *
    Q       . . . Well what I'm looking for is what triggered
            you?
    A:      You mean like a motive?
    Q:      Yes a motive perhaps, but what triggered you to
            grab the knife and go do this.
    A:      I couldn't tell you.
```

Fell Interview Dec. 2, 2000, at 6, 8, 43, 44, Fell Ex. 62.

The government provided the defense with the statement of

Debra Fell's downstairs neighbor, Pat Johnson, who told

investigators on November 30, 2000, that she had heard loud

noises coming from the apartment above her for hours, both male

and female voices as well as sounds like things were being

thrown.  Gov't Ex. J, ECF No. 338.  Johnson was on the

government's witness list.  Gov't Ex. K.  According to Johnson,
no one from the defense contacted her prior to trial.  Fell Ex.
271.  In her declaration she states that

> On the night Debbie and Charlie died, it was very loud.
> I heard a lot of fighting and arguing.  I heard both
> female and male voices get loud and angry with the
> yelling.  There was a lot of thumping and it sounded
> like someone was playing the drums.  It sounded like
> they were throwing things around.  The slamming and
> banging voices and the yelling went on for hours.  It
> sounded like someone was going to come through the
> ceiling.

*Id.*

Fell argues that, given some evidence of a prolonged
altercation leading up to the killings, trial counsel had a duty
to investigate any circumstances that might have countered the
government's portrayal of Debra Fell and Charles Conway as
"defenseless victims" who "were sitting nearly passed out in the
living room when the attack occurred."  Trial Tr. vol. 1-1,
20:21-24, June 20, 2005.  Instead trial counsel essentially
adopted the government's narration:

> Something, something occurred at about one in the
> morning in that house . . . in Rutland.  Something
> occurred that caused Donnie Fell and Bobby Lee to snap,
> to pick up two knives and begin stabbing Debbie Fell
> and Charles Conway.  We may never know what that was.
> We know about a complicated relationship with his
> mother.  We know that he had been up there for several
> weeks trying to unite, and at times things were going
> well and at times things weren't going well, but there
> is no evidence whatsoever that explains what that event
> or catalyst was.  We just know what happened.  We just
> know what happened.

Trial Tr. vol. 12, 74:16-75:2, July 13, 2005.

At one point the government acknowledged to the Court that "since the outset of this case, due to the nature of the crimes involving, among other things, a murder of Mr. Fell's mother, the parties saw this as a psychological homicide case." Trial Tr. vol. 10-1, 56:14-18, July 8, 2005. Fell contends that trial counsel's failure to examine any and all facts that could shed any light on the events that preceded the killing of Conway and Debra Fell constituted ineffective assistance. Given this factual desert, the government was able to argue for example that there was no question about Fell's intent to kill Conway, because he stabbed him fifty times. Trial Tr. vol. 12, 27:16-18.

The government notes, accurately, that Johnson's testimony was inconsistent with other evidence in the case. The argument that Johnson's testimony was therefore not reliable, and the defense not ineffective for failing to develop it, however, reflects the government's view of the evidence. Although ultimately Johnson's testimony may not prove to be significant, it is not immaterial as a matter of law. Fell has adequately alleged that counsel were ineffective for failing to conduct a factual and forensic investigation of the Rutland homicides.

Likewise the contention that counsel were ineffective for failing to investigate the multiple documented instances of Debra Fell's violence, drinking and drug abuse and domestic disturbances in the months preceding her death must survive

summary dismissal.  The government argues that evidence that
Debra Fell had repeated encounters with the police, or multiple
violent incidents, would have been inconsistent with Fell's trial
strategy of acceptance of responsibility, as well as cumulative.
Pursuing a strategy of acceptance of responsibility—to the
exclusion of attempting to offer a rationale for the "something"
that occurred in Rutland, or attempting to differentiate between
Fell and Lee—may have been an acceptable trial strategy, if
informed.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 522 (2003)
(holding that *Strickland* requires that "a reviewing court . . .
consider the reasonableness of the investigation said to support
[the] strategy.").  The claim cannot be summarily dismissed
however.

### 10.  Claim XII

Fell claims that trial counsel were ineffective for failing
to investigate and present a diminished capacity defense for both
the guilt and penalty phases of trial.  He alleges that he
suffered from a combination of severe intoxication and mental
illness that rendered him unable to form the intent required to
commit the crimes.  He alleges further that the failure to
present a diminished capacity defense also undermined his
mitigation case both at guilt and penalty phases.

There was abundant evidence supporting the contention that
Fell, Lee, Debra Fell and Charles Conway were habitual consumers

59

of excessive amounts of alcohol and drugs in general and evidence that all had consumed drugs and/or alcohol on the evening of the killings.  Much of that evidence was presented to the jury, including transcripts of Fell's statements to police on December 1 and 2, 2000, and photographs of the Rutland crime scene.  In addition the jury heard from a witness who saw Fell and Lee just before they encountered Teresca King, who observed that they appeared "drunk" or "stoned."  Trial Tr. vol. 4-1, 34:12-13, June 24, 2005.

Dr. Mills, who evaluated Fell for the defense in 2000, noted documented abuse of drugs and alcohol from an early age.  In his report he stated "It is noteworthy that in fifteen hundred or so forensic evaluations, Mr. Fell is the most drug-abusing and chronically intoxicated individual whom I have evaluated."  Mills Report 3, Fell Ex. 3.  Dr. Lipman, who provided a neuropharmacological consultation, noted an early chronic history of abusing drugs and alcohol, and concluded that Fell suffered from a pathological drug appetite combined with a tendency to psychotic decompensation under extreme conditions of emotional stress, typically associated with uncontrolled rage.  This vulnerability to psychotic decompensation would be expected to increase when intoxicated and to increase further when

chronically intoxicated.[16]  Lipman Report 2, Fell Ex. 4.    The
government's expert Dr. Wetzel agreed that Fell began abusing
alcohol and drugs "at a remarkably early age," and that he had
"used an amazing amount of intoxicating substances."  Wetzel
Report, Oct. 11, 2002, at 3, Fell Ex. 7.  He also agreed that
Fell was intoxicated "for months prior to the crimes and at the
start of them.  It is uncertain . . . that he was ever sober
during these crimes."  *Id.* at 6.  In a subsequent report he
stated that he believed that Fell exaggerated the amount of
alcohol consumed, based on his ability to think and plan after
the crimes.  Wetzel Report, June 27, 2005, at 4, 7, Fell Ex. 9.
The government's expert Dr. Rabun agreed that Fell's intoxication
contributed to the commission of the crimes.  Rabun Report 15,
Fell Ex. 8.

Although trial counsel investigated Fell's early and current
history of drug and alcohol abuse and chronic intoxication,
counsel early on decided not to pursue drug or alcohol use or a
mental health defense largely because they believed the plea

---

[16]  Dr. Lipman's report stated:
Considering Mr. Fell's diagnostic history and his current
psychometric and projective psychological test findings, these
interpreted in light of his relatively normal current
neuropsychological test performance, it appears that in addition
to suffering a pathological drug appetite, he also suffers from a
related constitutional neuropsychobiological vulnerability to
psychotic decompensation under extreme conditions of emotional
stress.  Historically this has been associated with uncontrolled
rage.  This vulnerability would be expected to increase when
intoxicated and to increase further when chronically intoxicated
as was the case at the time of the offenses.
Lipman Report 2, Fell Ex. 4.

agreement would be accepted.  *See, e.g.*, Bunin Decl. ¶¶ 11, 30,
Fell Ex. 264.  Although trial counsel alleged diminished capacity
in the penalty phase,[17] they withdrew their mental health notice,
withdrew as a mitigating factor that Fell was under mental and
emotional disturbance when the crimes were committed, and did not
call their mental health experts, all in an attempt to avoid the
expected testimony of the government's expert Dr. Welner.  The
effect was arguably significant:  although the jury received
evidence that Fell had been drinking heavily and taking drugs at
the time of the Rutland crimes, no juror found as a mitigating
factor that Fell's capacity to appreciate his conduct was
significantly impaired.  *See* Special Verdict Form 12, 15.

    The government argues that trial counsel made a reasonable
strategic decision not to pursue a diminished capacity defense
and to rely instead on acceptance of responsibility and remorse,
contending that its mental health evidence would have completely
overcome Fell's allegation of diminished capacity.  Without
hearing Fell's evidence of diminished capacity, the Court is
unable to conclude that the decision was the product of a
reasonable strategy.  Remorse and acceptance of responsibility
are not inconsistent with a diminished capacity as a defense or a
mitigator, of course.

---

[17]  Mitigating Factor No. 1 alleged that Fell's capacity to appreciate
his conduct was significantly impaired.  Special Verdict Form 12, 15, ECF No.
200.

Fell has stated a plausible, non-frivolous claim that counsels' decision not to pursue diminished capacity in the guilt phase, and to severely curtail presentation of diminished capacity evidence in the penalty phase, was constitutionally ineffective. Whether the decision to limit diminished capacity as a defense or a mitigator was reasonably informed cannot be determined without further development of the record.

### 11. Claim XIII

Trial counsel offered as a mitigating factor that Fell's execution would detrimentally affect persons who care about him (Mitigating Factor 7). In support of this mitigator, trial counsel offered the testimony of Fell's teacher at the correctional facility, who testified that she valued Fell's accomplishments while in the facility and would hate to see an end to that. Trial Tr. vol. 8-1, 82, July 6, 2005. Although Fell's sister Teri Fell testified, the defense did not ask her any questions about her current relationship with her brother or how she felt about him. If asked, Teri would have testified that

> Donny is all that is left of my family now. In many ways, he's been my only real family for most of my life.
> *      *      *
> A lot of time, it was Donny taking care of me, getting me food, making sure I took a shower before bed. My parents were too busy drinking to look after me. Donny was very young when he was caring for me. He did that as far back as I can remember.
> *      *      *
> If my brother were to ever be executed, that would kill me. He is all I have left of my family. I can't even

explain how much he means to me.  I can't even put it
into words.  He is the only person who knows what I
have been through, because he was right there with me.
He looked out for me throughout my life, when no one
else did.  Even now, he is a better support to me than
anyone else in my life.

T. Fell Decl. 1, 8, 31, Fell Ex. 278.  Post-conviction counsel
assert that there were additional family and friends who would
have presented a dramatically different picture of Fell's
positive qualities and the emotional value he holds for them.

The government argues that the additional evidence is
meager, subject to detrimental cross-examination, and if trial
counsels' failure to present additional evidence on this
mitigator was error, Fell cannot show prejudice.  As part of a
picture of the cumulative impact of multiple failures to conduct
a thorough investigation and present a thorough mitigation case,
the claim survives summary dismissal.

### 12.  Claim XIV

Fell claims that trial counsel were ineffective for failing
to object to evidence that was inflammatory and either minimally
probative or irrelevant.  Specifically, trial counsel:
stipulated to the admission of Fell's T-shirt depicting a horned
demon and the logo of a heavy metal band "Slayer;" failed to
object to testimony about Satanism and Fell's tattoos; failed to
seek a limiting instruction or object to argument concerning
testimony from Matthew Cunningham; and failed to object to
argument that Fell's remembering the word "Hawk" on one of the

knives at the Rutland crime scene meant that he could not have been substantially impaired.

### a. T-shirt

When arrested in Arkansas, Fell was wearing a black T-shirt depicting a horned demon and the logo for the heavy metal band "Slayer." Fibers consistent with the T-shirt were found at the scene of King's murder, and Fell admitted that he had been wearing the T-shirt when King was killed. The T-shirt was published to the jury on the first day of trial. The government referred to the T-shirt in its guilt-phase closing: " . . . a T-shirt that says "Slayer" on it and a T-shirt that otherwise speaks for itself." Trial Tr. vol. 4-1, 55:24-56:1, June 24, 2005. Fell argues that the T-shirt had minimal probative value because Fell admitted that he was at the crime scene wearing the T-shirt. The government responds that Fell pleaded not guilty to the charges and put the government to its proof.

### b. Testimony about Satanism

Without objection, the government elicited testimony from Fell's sister Teri concerning Fell's religious beliefs and interest in Satanism:

> Q   Did he have any other interests in religion?
> A   No.
> Q   Did he have any interests against religion?
> A   He wasn't a religious person at all.
> Q   Can you explain that to the jurors?
> A   He didn't believe in God.
> Q   What did he believe in?
> A   Well, when we were first living in Wilkes-

```
                    Barre, he didn't believe in anything, and
                    then towards – by the time I moved out of
                    Aunt Jackie's house when I was 16, he talked
                    about Satan, but I don't know if he worshiped
                    Satan.  I don't believe that he worshiped
                    Satan.  He didn't have a Satanic bible or
                    anything like that.
            Q       What did he say, if anything, about Satan?
            A       He would just make jokes about Satan being
                    the kindest beast, and that was it, and that
                    he normally talked to me about National
                    Geographic.
            Q       And I'm sorry, you said Satan is the kindest
                    beast?
            A       Yes.
            Q       I'm sorry, what does that mean?
            A       I don't know.
            Q       Do you know, if as a result of that, he has
                    any tattoos?
            A       Yes, he does.
            Q       And what are those tattoos?
            A       On his left arm, I do believe he has got an
                    upside down cross with 666. And on his right
                    arm he has got an anarchy sign.
            Q       Do you know what the upside down cross with
                    666 means?
            A       It represents Satan.
            Q       Do you know when he got that?
            A       I don't know that.  Probably – I think he was
                    15 or 16 when he got it.
```

Trial Tr. vol. 7, 142:18-144:2, July 1, 2005.  As the Second

Circuit observed in this case,

> While evidence of the defendant's abstract moral
> beliefs may in some cases be constitutionally
> admissible to show motive, there must be stronger
> evidence of the connection than occurred here and it
> was a mistake for the prosecutor to offer the evidence.
> Although the government posits on appeal a relationship
> between the t-shirt Fell wore during the murders and
> Fell's satanic interests and his motive for killing
> Teresca King, we are not persuaded by the relevance of
> this evidence, which in any event was not argued to the
> jury.

*Fell*, 531 F.3d at 230 (citation omitted).  Reviewing the error,

the panel concluded that Fell could not show prejudice, however, given the strength of the government's case and this Court's instruction to the jury that it could not consider Fell's religious beliefs in rendering its decision. *See id.*

### c. Matt Cunningham testimony

During the penalty phase rebuttal, the government offered testimony of Matt Cunningham, one of Fell's friends from Wilkes-Barre, Pennsylvania. Cunningham testified that Fell made it clear that he didn't like his mother, and would say things like "I could kill her." Trial Tr. vol. 11, 51:17, July 12, 2005. Cunningham said he didn't take Fell seriously. Another time a group including Fell and Cunningham talked about killing and the conversation "went along the lines of, well, if you killed one person, why stop there? Because you are going to get the same punishment anyway . . . ." *Id.* at 52:9-11. In a conference about this testimony's admissibility, the Court offered to give a limiting instruction after the testimony was offered, but trial counsel did not request one. *See id.* at 33:13-22.

In penalty-phase summation the government argued, without objection from the defense:

> You know as a matter of common sense that people have free will, and particularly when they grow up, they have free will to do the right thing and to decide what's right and what's wrong. And you know that for years, Donald Fell thought about killing. He thought about killing John Kozierski, his teacher, back when he was starting out in high school. A couple more years went by, and in conversations with Matthew Cunningham,

67

a guy he hung out with back then, he thought about
killing then.  Talked about maybe killing his mother.
And he thought, if you're going to kill someone, why
stop at one.
          And more years went by, and he became an adult,
and he came to Vermont, and after years of thinking
about killing, he decided to kill, and kill again, and
he had four hours to think about what to do with Terry
King, and he decided to kill her too.
          People are responsible for what they do,
particularly when they do severe, heinous crimes like
this.

Trial Tr. vol. 12, 127:19-128:13, July 13, 2005.  Fell argues

that the government used Cunningham's testimony to establish

premeditation and motive.  The government contends that it was

arguing that Fell had the ability to make free choices.  In

context it is clear that the government embedded a contention

that Fell engaged in substantial premeditation about killing

within a discussion of his ability to exercise free will.

### d.    Memory of the word "Hawk" on the knife

One of the police officers who reported to the Rutland crime

scene testified that a knife bearing the word "Hawk" on it was

left behind at the crime scene.  Fell described the knife he used

against Charles Conway as having little serrated edges on it with

the work "Hawk" on the blade.  *See* Fell Interview, Dec. 2, 2000,

at 16, Fell Ex. 66.

The government argued that Fell could not have been

significantly impaired because four days after the killings when

he spoke to the police he remembered details of the events:

Next, you also know the defendant remembered these

events clearly four days later.  Think about it, ladies
and gentlemen.  If he was significantly impaired at the
time, would he remember that the knife he was using
said the words Hawk on it?  Would he be able to
describe the difference between the two knives as he
did, one with Hawk on it, and the other as a black-
handled knife.  There are many other instances of his
memory that day . . . . No question that he was not
significantly impaired.

Trial Tr. vol. 12, 40:3-15, July 13, 2005.

Fell claims trial counsel should have objected, arguing that
there was evidence that numerous items in the Rutland apartment
bore the logo "Hawk," that Fell was familiar with these items,
and therefore his memory of this fact bore no correlation to his
level of intoxication.

These four instances of stipulating to or failing to object
to the admission or use of inflammatory and prejudicial evidence
do not individually rise to the level of ineffective assistance
of counsel.  In hindsight the failure to object may seem
inexplicable.  At the time, trial counsel could well have
concluded that objection would be futile and/or would have drawn
unwanted attention to the evidence.

The defense might not have succeeded in convincing the Court
to exclude the T-shirt (although an effort to limit the
government's suggestive use of "Slayer" at trial might have fared
better).  Although the testimony regarding Satanism was
objectionable, the Second Circuit concluded that its admission
did not prejudice Fell in light of all of the evidence produced

at trial.  Furthermore, trial counsel elicited testimony from Matthew Cunningham that put the tattoos in the context of teenage heavy metal fans rather than something more sinister.

Cunningham's testimony about meditating on multiple killing was never actually attributed to Fell as opposed to the group in general, and Cunningham made clear his belief that this conversation and Fell's manifest anger with his mother was just talk.  Objection to the government's linking the two comments to suggest substantial premeditation in its rebuttal might well have been sustained; counsel could well have concluded however that objecting or seeking a limiting instruction from the Court would cause the jury to attach greater rather than lesser significance to the conversations.

In contrast to the other three instances however, there was nothing objectionable about the government's argument that Fell's ability to remember details weighed against his having been significantly impaired.  Trial counsel's failure to argue against this inference was not error, and this portion of Claim XIV is dismissed for failure to allege a plausible claim for relief.

Because Fell has also alleged that the cumulative effect of trial counsel's errors amounted to ineffective assistance of counsel, the Court will not summarily dismiss the remainder of Claim XIV at this time.

### 13.  Claim XV

Fell alleges that trial counsel were ineffective for failing to preserve the record for appeal.  As the Second Circuit panel noted in its decision affirming his conviction and sentence, "[n]early all the evidentiary issues Fell raises were not preserved at trial and were presented for the first time either in his motion for a new trial or on appeal."  *Fell*, 531 F.3d at 209.  Specifically, Fell faults his trial counsel's failure to object to (1) the government's comments during summation about his decision not to plead guilty; (2) the government's evidence and argument relating to religious beliefs; and (3) the government's argument that the jury could not consider mitigating evidence unrelated to the crimes.  Fell also faults appellate counsel for failing to raise evidentiary arguments that were not raised by trial counsel.

### a.  Failure to object

As evidence of the mitigating factor of acceptance of responsibility, the defense informed the jury that Fell had offered to plead guilty in exchange for a sentence of life without possibility of release.  In summation the prosecutor commented that Fell could have pleaded guilty unconditionally. On appeal, the Second Circuit concluded that the government's comments on Fell's decision to proceed to trial were not improper.  *Fell*, 531 F.3d at 221.

The prosecutor also argued in summation against the mitigating factor that Fell had made positive contributions while incarcerated by suggesting that Fell's interest in Christian bible study, Islam and Native American practices was feigned in order to manufacture grievances and a lawsuit. The Second Circuit concluded that there was no error in the admission of the evidence. *Id.* at 230. By that reasoning, the prosecutor's brief comments,[18] focusing on the manipulation rather than the religious belief, were likewise not error.

Also in summation the prosecutor argued that the jury should accord little to no weight to mitigating factors that were not connected to the crimes. Specifically, he argued:

> [A]s we discuss [the mitigating factors], I want to just talk to you and remind you again about the two questions I raised earlier about the mitigating factors, because, . . . you should consider, one, what do these factors have to do with the crimes in this case? And do these factors actually lessen the defendant's responsibility and culpability for these crimes? . . . [E]ven if you find evidence of some of these mitigating factors, we submit to you that the weight of these factors is not that heavy, and you need not give them much, if any weight based upon those two questions.

---

[18] The prosecutor stated:
They want to claim that he is a positive contribution in resolving grievances? You heard from Jason Rushlow. The man generated grievances. Are you kidding me? You saw the lawsuit. You can read it for yourself when you go back there. This man signs up for bible study, and then files a lawsuit claiming to be . . . a Native American. He files a lawsuit so that he can practice his Native American religion on the yard. It's bogus, ladies and gentlemen. You know it's even more bogus because, believe it or not, he observes Ramadan as a Muslim. Ladies and gentlemen, what do you see from this? He's still manipulating even from prison.
Trial Tr. vol. 12, 48:19-49:6, July 13, 2005.

Trial Tr. vol. 12, 37:23-38:11, July 13, 2005.  Later, he
returned to this theme:

> [Y]ou have heard so much about the defendant's
> childhood, so much about his background, and again, let
> me just remind you, the question is, . . . what's the
> connection between his background and childhood and
> these crimes?  What about his background and childhood
> makes him less responsible, less culpable?  What about
> them means that he should receive a less – a lesser
> sentence?

*Id.* at 52:9-17.  With respect to a sexual assault suffered as a
child:

> The question is, what does that sexual assault when he
> was four or five have to do with the crimes in this
> case?  Sixteen years later, there's nothing sexual
> about these crimes.  There's nothing about that
> background and that history that shows you that he is
> less responsible for the decisions that he made,
> decisions like killing a witness.  How does that have
> to do with what happened to him, which was terrible?

*Id.* at 55:3-11.  With respect to his parents having been
alcoholic, been violent and abandoned him, the prosecutor argued:
"His parents didn't cause him to commit these murders.  His
parents didn't cause him to stab Charlie Conway.  And what on
earth do his parents have to do with Terry King?  Nothing, ladies
and gentlemen."  *Id.* at 61:1-5.  With respect to Fell's drug and
alcohol use:  "Does that fact, that he liked to drink beer and
smoke pot, does that mean that we should be lenient to him for
this crime?  What does that have to do with this crime?
Nothing."  *Id.* at 61:17-20.  Finally, "What's the evidence of the
mitigating factors?  To the extent you find some, there are not

that many, respectfully, and they really don't relate to the crimes." *Id.* at 64:13-16.

This Court found that government counsel tied acceptable argument—that the jury should accord little or no weight to Fell's mitigating evidence—with improper comments that the jury should not accord much if any weight to his background and childhood evidence because it lacked any connection to the crimes he committed. Apr. 24, 2006 Op. & Order 31, ECF No. 236. It concluded however that under all the circumstances it was not reasonably probable that the outcome of the penalty phase of the trial would have been different had the prosecutor not made the improper remarks. *Id.* at 33-34. On appeal the Second Circuit concluded that in light of the instructions to the jury, among other factors, "there was no reasonable likelihood that the jurors believed themselves to be precluded from considering Fell's mitigating evidence unless it related to his charged crimes." *Fell*, 531 F.3d at 223.

Although Fell could not show that the improper argument prejudiced him, as part of a claim of ineffective assistance of counsel based on the prejudicial effect of cumulative errors, this portion of Claim XV withstands summary dismissal.

### b.    Ineffective assistance of appellate counsel

Fell also alleges that appellate counsel were ineffective for failing to raise on direct appeal several instances of trial

counsels' failure to make evidentiary objections:  (1)
unspecified leading questions during the guilt phase; (2) Teri
Fell's testimony about the Eike assault; (3) a police officer's
agreement with the prosecution's suggestion that Debra Fell was a
battered spouse;[19] (4) cross-examining one of Fell's social
workers, William Kane, on whether he believed that each
individual has to make choices in life and be held accountable
for those choices; (5) Cunningham's testimony about the multiple
murders conversation; and (6) testimony from one of Fell's
friends, Matthew Kolojeski, that he "had a tolerance for
alcohol,"  that "he was somebody that could drink a little bit
more than most people without actually being impaired too easy."
Trial Tr. vol. 3, 117:14-25, June 23, 2005.

    With the exception of the testimony about the Eike assault,
addressed in section III.A.4.a, these instances of trial
counsels' failure to object did not constitute meritorious appeal
issues.  Fell has failed to specify the leading questions to
which trial counsel should have objected.  The police officer had
extensive experience with domestic violence in general and in

_____

    [19]  After several questions on direct examination about violence in the
Fell household instigated by Fell's father, the prosecutor asked the following
on cross-examination:
        Q    And in the altercations that you witnessed, were you able to
             distinguish who the main aggressor was or the main assailant?
        A    Basically it was Mr. Fell.
        Q    All right.  Do you know whether or not you came to regard Mrs.
             Fell as essentially a battered woman or a battered spouse?
        A    I would – that's fair to say that, yes.
Trial Tr. vol 7-2, 42:7-14, July 1, 2005.

connection with the Fell household, and if the question was objectionable, the government did not pursue the issue. Assuming for the sake of argument that the Kane cross-examination was objectionable, an appeals court would not have found prejudice in this brief exchange.

As discussed in section III.A.12.c, the Court had already ruled that Cunningham could testify about the conversations. Cunningham did not actually testify that Fell himself made the multiple murder statement and counsel could well have believed that further objection or a request for a limiting instruction would not have improved the record. Finally, with respect to the Kolojeski testimony lacking foundation, the government established that he had many opportunities to observe Fell drinking, and therefore testified based on personal experience and observation. An objection based on lack of foundation would not have been sustained. Were counsel to have objected for lack of foundation, he would have run the risk of allowing the jury to hear much more extensive testimony about Fell's ability to consume large quantities of alcohol and not appear affected.

The Court therefore grants summary dismissal of the allegations in Claim XV, with the exception that the failure to object to improper prosecutorial argument concerning Fell's mitigating evidence may form part of a cumulative ineffective assistance claim. Any issues concerning the Eike assault are not

dismissed and are subsumed in Claim VI.

### 14.   Claim XVIII - Ineffective Assistance of Counsel

A much-disputed point during trial was whether and to what extent Fell and Lee consumed drugs and alcohol on the night of the Rutland murders.  The government repeatedly argued that there was no evidence that Fell and Lee were impaired.  Fell claims that trial counsels' failure to investigate certain physical evidence that was recovered from the car when Fell and Lee were arrested in Arkansas, and failure to follow up on evidence of drug and alcohol consumption in Rutland, constituted ineffective assistance of counsel, because the presence of drugs or drug paraphernalia found in the car or at the crime scene would have provided crucial corroborating evidence about their level of impairment.

As discussed in section III.A.10, Fell has stated a plausible, non-frivolous claim (Claim XII) that the decision to severely curtail presentation of diminished capacity evidence in the penalty phase was constitutionally ineffective.  Whether the failure to investigate potential corroborating evidence of diminished capacity constituted ineffective assistance of counsel will depend on the resolution of Claim XII.  Therefore the request for summary dismissal of this portion of Claim XVIII is denied.

### 15.  Claim XXIII - Ineffective Assistance

Fell claims that trial counsel unreasonably failed to question jurors about whether they could fairly consider particular forms of mitigation evidence relevant to the case. Specifically, although jurors were asked to disclose whether they or anyone close to them had ever been treated for a substance abuse problem, they were never asked about problems with untreated substance abuse.  In addition, prospective jurors were not asked about their attitudes about drug abuse generally, including whether they had been victims of drug-related crime or were exposed to drugs in their neighborhoods or schools or community.  Although the government argues that the juror questionnaire and trial counsel's voir dire adequately covered the topics, the claim has been adequately pled, and survives summary dismissal.

Fell also claims that trial counsel failed to adequately question or attempt to rehabilitate prospective jurors who suggested that they could not vote for the death penalty.  As an example he discusses prospective Juror 64, who was challenged for cause because after extended questioning, she expressed her view that she "would definitely lean more towards life imprisonment than I would towards the death sentence, yes."  *Fell*, 531 F.3d at 212; *see* Voir Dire Tr. 251:1-21, May 13, 2005, ECF No. 265.  The Second Circuit affirmed the Court's decision to excuse her.

*Fell*, 531 F.3d at 213.  Fell alleges that with additional rehabilitation questions there is a reasonable probability that trial counsel could have prevented her excusal, and could have similarly rehabilitated other jurors.

The Constitution guarantees an adequate voir dire to identify unqualified jurors.  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  Prospective jurors who oppose the death penalty—no less than those who favor it—may be qualified to sit in a death penalty case if they can obey their oath to follow the law and the court's instructions.  *See Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  To be constitutionally compelled, however, the failure to ask questions that might have been helpful to a determination of a prospective juror's qualification must render the trial fundamentally unfair.  *See Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991).

Juror 64 was excused after the Court asked her:

the fundamental question about whether you can be fair
to both sides, that's what I need to know.  And so, do
you think that, based upon your views, you might lean
unfairly in one favor toward one side or the other?  Or
do you feel that you could put aside any views or you
don't have any views which would prejudice you in any
way and that you could be very impartial in your
decision about whether the death penalty is appropriate
or whether life imprisonment is appropriate?  And . . .
I am asking for quite an honest, reflective response.

Voir Dire Tr. 251:7-17.  Juror 64 responded:  "I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes."  *Id.*

at 251:18-21.

The excusal of Juror 64 did not render Fell's trial fundamentally unfair, as the Second Circuit necessarily found when it concluded that this Court acted within its discretion. *See Fell*, 531 F.3d at 213. The juror responded to a question about her ability to be fair and impartial that she would "definitely" favor life imprisonment. However, ambiguous or qualified her earlier responses were, this last response was not ambiguous. Additional questions from defense or prosecution would not have clarified the response or rendered it unsaid. The Court reviewed the juror's written and oral responses and concluded: "And even though she could necessarily follow instructions, I think that in context, she could not be fair and impartial." Voir Dire Tr. 255:9-11.

Although it is true that the Second Circuit did not consider whether trial counsel were ineffective in failing to ask additional questions to attempt to rehabilitate this and unnamed other jurors, to establish ineffective assistance of counsel Fell would have to show that deficient questioning rendered the trial fundamentally unfair. Fell has not asserted a plausible claim that trial counsel's allegedly inadequate questioning was prejudicial. *See Strickland*, 466 U.S. at 687.[20]

---

[20] Also as part of Claim XXIII, Fell asserts that trial counsel were ineffective for presenting the mitigation factor that he was twenty years old at the time of the offense, while failing to investigate and explain to the jury the mitigating impact of his youth. Claims of ineffective assistance of

## 16. Claim XVI

In Claim XVI, Fell argues that the cumulative impact of trial counsels' deficient performance deprived him of a fair trial. Given that separate instances of alleged ineffectiveness survive the government's request for summary dismissal, the Court allows the cumulative impact claim to stand.

### B. Prosecutorial Misconduct Claims

With respect to prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Even in cases of egregious prosecutorial misconduct, a new trial is required only when tainted evidence was material to the case. *Id.* n.10 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 272 (1959)).

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The duty to disclose applies even though there has been no request by the accused, *United States v.*

counsel with respect to failing to investigate and failing to present evidence, including expert evidence to support various mitigating factors, have been addressed in sections III.A.2 (Claim IV) and III.A.3 (Claim III) above. This portion of Claim XXIII may proceed as part of those claims or as part of the cumulative effect claim (Claim XVI).

*Agurs*, 427 U.S. 97, 107 (1976), and the duty includes impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Bagley*, 473 U.S. at 682). A reasonable probability exists when the favorable evidence could reasonably be taken to undermine confidence in the outcome of the trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

A prosecutor has a duty to disclose exculpatory or impeachment evidence known to others acting on the government's behalf, whether or not the prosecutor is aware of the evidence. *Strickler*, 527 U.S. at 281. The impact of the suppressed evidence will be considered cumulatively, not individually. *Kyles*, 514 U.S. at 436-37.

There are three components of a *Brady* prosecutorial misconduct claim: the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; the evidence must have been suppressed, either willfully or inadvertently; and the suppression must have resulted in prejudice. *Strickler*, 527 U.S. at 282. Evidence is not "suppressed," however, if a defendant either knew or should have known of the essential facts permitting him to take

advantage of the evidence.  *See United States v. Orena*, 145 F.3d 551, 558 n.4 (2d Cir. 1998); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982).

If *Brady* constitutional error is found, the error cannot be treated as harmless.  *Kyles*, 514 U.S. at 435-36.

If "a prosecutor elicits testimony he . . . knows or should know to be false, or allows such testimony to go uncorrected," a verdict "must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Shi Wei Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)); *accord United States v. Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008); *see also Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 269.  Nevertheless, in this Circuit, "for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying . . . witness."  *Shi Wei Su*, 335 F.3d at 127 (citing *United States v. Helmsley*, 985 F.2d 1202, 1208 (2d Cir. 1993)).

### 1.   Claim VI – Prosecutorial Misconduct

In addition to his claim of ineffective assistance of counsel, Fell claims that the government committed misconduct with respect to the Eike assault.  During the testimony of FBI Special Agent Jimmie Caudle, on the second day of trial, the government, without objection from the defense, elicited the

83

following:

> Fell also advised that, that he had gotten into some
> legal trouble at the most recent Woodstock Festival.
> Lee had accompanied Fell to the, to the Woodstock
> Festival.  And there was an incident where, as Fell
> described it, he quote beat the shit unquote or end
> quote out of an individual who he said was trying to
> rape his sister.
> Lee advised that he put the guy in a coma for about a
> day and that charges were eventually dropped against
> Mr. Fell.

Trial Tr. vol. 2-1, 6:17-7:1, June 20, 2005.  In its cross-

examination of Teri Fell during the penalty phase the government

elicited similar testimony, and asked specifically:

> Q    Did the kid go into shock and into a coma?
> A    Yes, he did.

Trial Tr. vol. 7-1, 146:24-25, July 1, 2005.  In summation the

government drew the jury's attention to this incident, pointing

out the similarities to the assault on Teresca King:

> What did [Teri Fell] tell you?  Donald Fell committed a
> horrible, violent assault on a person the same way he
> then later killed Terry King.  He did it intentionally.
> He did it violently.  And he did it with the utter
> depravity that you have heard about in this case.  He
> did it in that case.  Remember what he did after he
> beat that man with his feet into a coma.

Trial Tr. vol. 12, 60:13-19, July 13, 2005.  In rebuttal, the

government reiterated:  "It wasn't enough for [Fell], in New

York, in August 2000, to knock that guy down and to stomp him

into a coma."  *Id.* at 124:5-7.

Fell contends that the government was well aware that the

victim of the Woodstock assault, Christopher Eike, was never in a

coma.

The government disclosed FBI 302 reports of Fell's and Lee's interviews and transcripts and summaries of their oral statements.  The government also disclosed a copy of the New York state incident report, along with statements given by Fell and Lee to the Sullivan County sheriff's department.  In addition the defense was provided with statements from Teri Fell, Lee's brother Anthony Tonte, another witness Lance Rowland, the charge sheet showing the charges brought against Fell and Lee, and a certificate noting the disposition of Lee's charges.  The defense also obtained the certificate of disposition of Fell's charges.

The government interviewed Eike in June 2005.  According to the FBI 302, provided to the defense prior to trial, the FBI spoke to Eike at a state correctional institute in Pennsylvania where he was incarcerated.  Eike described how, high on acid, he repeatedly told his friends, including Fell, that he had to drive them home, although his car had been towed.  According to Eike, Fell came over to him and punched him in the face.  He fell, and Fell repeatedly punched him in the face and slammed his head on the stone floor.  Another person kicked him in the back.  Fell urinated on his leg and kicked him in the head and ribs.  Two men stopped the assault, a woman called 911, and Eike passed out.  He regained consciousness in an ambulance.  Eike denied that he had attempted to rape Teri Fell.  *See* Fell Ex. 129.

Post-conviction, the defense obtained additional documents from the Sullivan County sheriff's department.  The deputy who responded to the 911 call found Eike conscious, incoherent and shaking.  He treated Eike for shock and called an ambulance.  He questioned Eike about his injuries and Eike responded that he couldn't feel his body.  Fell Ex. 56.  Eike was transported to the hospital, treated and released the same day.  *Id.*  Police were able to question him about the assault at the hospital before he was released.  *Id.*  There is an arguable inference that police were considering charging Eike with sexual assault in connection with the incident.  *See* Sullivan County Sheriff's Dep't notes, Fell Ex. 55.

The defense also obtained documents from the Catskills Regional Medical Center that describe Eike's injuries as "scalp contusion" and "musculoskeletal sprain," Fell Ex. 286, that his medical status upon arrival at the hospital was "alert" and "oriented times three"[21], Fell Ex. 288, and that Eike was taking medicine for seizure disorders.  Fell Ex. 294.  Eike has made a sworn declaration that he passed out briefly in the ambulance, that he had no serious injuries and that he was not in a coma. He stated that when interviewed by the FBI about his injuries he told them he just had a black eye.  Fell Ex. 314.

---

[21]   The phrase is medical short-hand for a patient who is oriented to person, place and time.

The government's characterization of Eike's state as a coma was not true. Using the government's definition of "coma" as a state of profound unconsciousness, the evidence does not suggest that Eike was ever in a coma. The responding officer found Eike conscious. The ambulance personnel listed one of his presenting problems as "unconscious," *see* Fell Ex. 289, but within an hour of that observation Eike was alert and oriented. Apparently the only information the government had to support the characterization was from police interviews of Fell and Robert Lee in December 2000. Had the government reviewed the entire Sullivan County file when it provided the defense with some discovery concerning the Eike incident, it would have been on notice that the injuries were not as serious as reported by Lee and Fell. By June 2005, according to Eike, the government knew that his injuries were not serious and that he had not been in a coma.

Post-conviction, the defense also obtained records of Eike's criminal history, which included charges of sexual assault involving a minor and corruption of a minor in 2001, a guilty plea to the corruption charge in 2002, as well as a 2002 conviction for theft. Fell Ex. 94. The government admits that the FBI ran an NCIC criminal record check on Eike which revealed the indecent assault and corruption charges, and that this was not provided to the defense.

With respect to the *Brady* claim, the government argues that
the information obtained by Fell post-conviction was not
favorable and was not in the government's possession.  Fell has
adequately alleged that the information was exculpatory, and that
the government had or was aware of the existence of the
information.  As to whether Fell suffered prejudice, the issue is
not susceptible to determination at the summary dismissal stage.
The government acknowledges that the Eike assault was key
evidence in support of its argument that Fell was an extremely
violent person who showed no remorse, who committed a similar
assault within months of King's killing.  Evidence that Fell was
defending his sister, that the injuries were not serious, or that
multiple drugs in Eike's system may have contributed to a
temporary loss of consciousness, might have caused the jury to
weigh the aggravating and mitigating factors differently.  Fell's
*Brady* claim concerning the Eike assault survives summary
dismissal.

The knowing use of false evidence is a due process
violation.  *See Napue*, 360 U.S. at 269.  A prosecutor's comments
during summation that capitalize upon deceptive or false evidence
may "'so infect [a] trial with unfairness as to make the
resulting conviction a denial of due process.'"  *Jenkins v.
Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (quoting *Darden v.
Wainwright*, 477 U.S. 168, 180 (1986)); *accord Drake v. Portuondo*,

553 F.3d 230, 240 (2d Cir. 2009).

There is evidence that the government knew or should have known that the seriousness of the Eike assault was exaggerated, and that the assault may not have been unprovoked. Fell is entitled to discovery to determine whether the government knowingly exploited the misinformation communicated by Fell, Lee and Teri Fell to argue in summation that Fell was the sort of person who would commit "horrible, violent" assaults with "utter depravity," beating a person with his feet into a coma. Trial Tr. vol. 12, 60:13-19.

### 2. Claim VII – Prosecutorial Misconduct

During the penalty phase, the defense put on evidence to support the mitigating factors that Fell did not present a risk to other prison inmates and that he had made positive contributions to the correctional facility. The government informed trial counsel of its intent to offer records from Fell's file and to call witnesses to incidents described in those records. Fell Ex. 122. One incident involved correctional officer Marc Pelkey.

The government presented evidence in rebuttal of two disciplinary incidents in which Fell failed to comply with commands and showed aggressive behavior to correctional officers. In its summation the government argued that Fell had anger and aggression problems and that his behavior was deteriorating over

time.

Fell claims that Pelkey had a reputation for and history of violent behavior and in fact attempted to assault Fell during the incident that involved Pelkey. Fell alleges that the failure to disclose Pelkey's history of misconduct was a *Brady* violation. The government argues that the claim must be summarily dismissed because Pelkey's history or reputation for misconduct was not exculpatory, his disciplinary history was not in the government's possession and Fell suffered no prejudice.

Evidence that Pelkey engaged in excessive force in the incident that the government displayed to the jury was clearly favorable, in that it tended to counter the impression the government sought to convey of an inmate who was making unprovoked attacks and becoming increasingly violent.

A prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Fell asserts that he obtained information concerning Pelkey having used excessive force via a Freedom of Information Act request to the United States Marshals Service ("USMS"), a federal agency.

If members of the USMS worked in conjunction with either police or prosecutor then they may be treated as an "arm of the prosecutor," for *Brady* purposes. *See Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir. 1985). Fell argues that because he was in the

custody of the USMS, who was responsible, among other things, for his transportation to and from the courthouse during trial, the USMS was part of the prosecution team, citing *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (holding that imputation of the withheld evidence to the government was proper, as "it is impossible to say in good conscience that the U.S. Marshal's Service was not 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence.").

In this Circuit, whether an individual is deemed an arm of the prosecution for *Brady* purposes is determined by examining "what the person *did*, not who the person *is*." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). On the current state of the record it is impossible to determine whether any member of the USMS may have acquired knowledge of Pelkey's behavior or his history with regard to inmate incidents, and what that individual or individuals did in connection with Fell's prosecution.

In support of its argument that Fell was not prejudiced, the government notes that the jury viewed the videotape of the incident and heard the testimony of correctional officer Greg Machia. From this evidence it argues that "it is clear from [this evidence] that Officer Pelkey did absolutely nothing on March 17, 2004, to provoke Fell's actions." Opp'n 221. Fell

points out that the alleged provocation cannot be seen from the tape, and that evidence of Pelkey's having been investigated for excessive force in this incident, plus his record of misconduct, would have enabled the defense to argue that Pelkey was the catalyst in the incident.

Fell has stated a plausible claim that the USMS was acting in conjunction with the prosecution, and he is entitled to discovery to determine whether the failure to disclose Pelkey's behavior during the incident or his disciplinary history may be imputed to the government for purposes of pursuing a *Brady* claim, and whether the government learned any pertinent information concerning excessive force or misconduct from Pelkey while he was a potential witness for the government.

### 3. Claim VIII – Prosecutorial Misconduct

Fell alleges that the government failed to disclose a substantial amount of evidence about Robert Lee, including prison records, social service records, medical records, educational records and law enforcement records, that would have shed light on Lee's role as more or equally culpable in the crimes. According to Fell, the FBI had prison records for Lee that demonstrated hostility towards mothers; violent, aggressive and disruptive tendencies; and contradicted any impression of him as a docile follower. On Lee's intake medical screening form dated December 13, 2000, he indicated that he had used marijuana and

crack cocaine three weeks previously.  The prisoner intake form

for Lee upon his arrest in Arkansas noted suicidal tendencies:

"talks about wanting to die."  Fell Ex. 67.  Writings found in

Lee's cell after his death expressed homicidal thoughts.  The

government also did not produce a written report of the FBI's

interview with Francis Bellantoni, the witness who may have seen

Fell and Lee arguing by the roadside prior to the murder of

Teresca King.

The government argues that trial counsel deliberately chose

not to introduce evidence about the relationship between Fell and

Lee or any statements that he might have made, and to a great

extent avoided mention of Lee.  The decision was a strategic one,

the government argues, to avoid triggering damaging rebuttal

evidence.  The strategy was partially successful; the Court ruled

that the government could present rebuttal evidence relating to

Fell's character and background, but that it could not present

rebuttal evidence relating to Lee's character and background,

because the defense had not opened the door to such testimony.

*See* Trial Tr. vol. 11, 17:15-25, July 12, 2005.  Therefore,

according to the government, the undisclosed information was

irrelevant to the defense and could not have prejudiced Fell.

The government does not dispute that it was in possession of

such information.  It emphasized that Fell was the aggressor and

dominator, at the same time it possessed and failed to turn over

information that allegedly tended to contradict this impression. Whether trial counsel made reasonably informed strategic decisions to avoid a debate about Lee's character or his relationship with Fell at trial cannot be determined without knowing what the withheld information reflected. Evidence concerning Lee's prison behavior was relevant to the mitigating factor that Fell acted in concert with Lee, even if the information wouldn't necessarily establish the mitigating factor.

Although it is true that trial counsel could have supoenaed Lee's prison files, the question whether trial counsel knew or should have known that the files would contain evidence that Lee was violent and disturbed as opposed to a passive follower cannot be determined at this summary dismissal stage.

Likewise the government does not dispute that it failed to disclose a form 302 from the FBI's interview with Bellantoni on December 12, 2000, merely stating in a footnote that the 302 did not contain any more information than Fell received in the New York state police report. This may be or may not be true, but without a comparison of the two reports the Court is unable to determine whether the undisclosed document contains favorable information.

Finally, the parties dispute whether the government disclosed its entire investigation of Lee. The government contends that it disclosed the results of the FBI investigation,

citing to its Exhibit B.  Fell contends that the government
conducted further investigation in connection with its expert Dr.
Welner, and that there were numerous interviews conducted in 2005
that were not disclosed.  *See* Discussion of Claim XVII below,
section III.B.4.  Whether the government disclosed its entire
investigation cannot be resolved at summary dismissal, nor can it
be determined whether the additional interviews produced
favorable information.

Fell has alleged that these failures to disclose prejudiced
him, because among other things he lacked evidence to support the
mitigating factor that "Donald Fell would not have committed the
crimes without the influence of Robert Lee."  Trial counsel
replaced this mitigating factor with "Donald Fell and Robert Lee
acted in concert in committing the crimes," but, according to
post-conviction counsel, provided the jury with no explanation as
to why this was a mitigating factor.[22]

---

[22] Trial counsel argued to the jury with respect to this factor:
One of the other mitigating factors that I want to talk about has
to do with, that Donnie Fell acted in concert with Bobby Lee. . .
. And what – what this means is, and I think you can understand
it, and I – that these two guys, these two, these two men, from
their [sic] time when they were kids, up until they are 20 years
old, were [sic] just fed off each other.  And we're not saying
that Donnie was not responsible.  We have admitted that he was
directly responsible for the killing of Conway and for at least
one of the causes of death of Mrs. King.  What we are saying is
that but for this child – this childhood influence, it wouldn't
have happened.  Bobby went up there, and they started drinking and
drugging again.  Something snapped with both of them which
resulted in two killings.  Donald Fell probably or is much less
likely to have been able to do both and/or would have never killed
his mother. . . . . I think it's common sense, based on all you
heard, that this thing would have never happened without being,
acting in concert with Bobby Lee. And that is a mitigating factor

95

In addition to lacking support for their mitigating factor, trial counsel also lacked evidence to attempt to counter the government's consistent portrayal of Fell as dominating Lee. The government stressed this theme in its guilt-phase summation[23] and during the penalty phase with the testimony of Matthew Cunningham. If favorable evidence was withheld, then the Court will assess the collective impact of the suppressed evidence, in determining whether there was prejudice. *See Kyles*, 514 U.S. at 436.

### 4. Claim XVII

Fell also makes a *Brady* claim based on the government's failure to disclose notes and reports of interviews conducted by

---

for you to consider.
Trial Tr. vol. 12, 79:12-80:15, July 13, 2005. The government had previously argued: "How is this mitigating? They did it together. . . . Ladies and gentlemen, use your common sense. The fact that Robert Lee was an accomplice in no way lessens this man's responsibility and culpability for those crimes." *Id.* at 51:20-52:4.

[23] The government stated:
Now let's say a few things about Bobby Lee. The defendant would have you believe that Bobby Lee, his best friend from childhood, was the one who made certain key decisions or did certain key things here. . . . you may not want to credit everything Fell said about what Lee did in his confessions because you know that Fell made false statements about a lot of things. . . . On the subject of Bobby Lee, Donald Fell's shotgun, the Fell apartment where Donny Fell was living, Donny Fell's mother, Donny Fell driving the car from the Price Chopper back to the house, Donald Fell getting the luggage, Donald Fell driving south out of Rutland, Donald Fell pulling over the car in Dover when he didn't want her in the car any more, and Donald Fell choosing the place to kill her. And if there was any more doubt about the dominance of Donald Fell in the Lee-Fell relationship listen to what he said when the police officer asked him on tape what he would have done at the Price Chopper if Lee had tried to stop him from car jacking Terry King. [tape played] The man who said that was the boss. He was bragging about his dominance over Bobby Lee.
Trial Tr. vol. 4, 69:4-72:5, June 24, 2005.

the FBI and Dr. Welner, and failure to disclose information obtained from social service agencies. According to the government's expert Dr. Welner, he and the FBI interviewed approximately 77 lay witnesses about Fell. The government acknowledged that Dr. Welner had interviewed people in Wilkes-Barre, both with and without the FBI present, and indicated that it would provide the notes and reports. Trial Tr. vol. 8-2, 76-77, July 6, 2005.

The next day, however, the defense withdrew its Rule 12.2 notice and entered into the mental health stipulation. Trial counsel turned their focus to preventing Dr. Welner from testifying, not obtaining discovery. The undisclosed notes and reports ceased to have any particular value to the defense with respect to the effort to preclude the testimony.

Fell has argued in addition however that to the extent that these notes and reports may have contained information that would mitigate against a sentence of death, they should have been provided to the defense regardless of whether Dr. Welner testified. The government responds that most of the interviewees were on the defense witness list, and the government had no obligation to provide reports or notes of interviews of defense witnesses.

Under *Brady*, the government must disclose evidence that is favorable to the defense. *See, e.g.*, *United States v. Orena*, 145

F.3d 551, 557 (2d Cir. 1998).  Noncompliance with *Brady*'s
disclosure obligation does not of itself constitute a *Brady*
violation, however.  *See United States v. Payne*, 63 F.3d 1200,
1208 (2d Cir. 1995) (finding that the government failed to comply
with its disclosure obligations, yet affirming the denial of a
new trial); *accord United States v. Gonzalez*, 110 F.3d 936, 943
(2d Cir. 1997) ("A new trial is warranted for a *Brady* violation
only where the defendant can establish that the government failed
to disclose favorable evidence, . . . and that the evidence was
material.").

The government has acknowledged that it did not disclose the
information; if it was favorable it had an obligation to disclose
it.  The parties dispute whether the notes and reports contained
any information, either impeaching or exculpatory, favorable to
the defense.  This dispute cannot be resolved without reviewing
the notes and reports in question.  Accordingly, this portion of
the claim cannot be summarily dismissed.

With respect to the social service agency information, Fell
asserts that in its 2001 report the FBI selectively excerpted a
psychosocial intake evaluation of Fell conducted in 1994 by a
social worker at St. Michael's school.  He points to a statement
in the complete document that "Mrs. Sharpe [Fell's grandmother,
deceased] had also alleged that her son-in-law [Fell's father]
was sexually abusive to the children as well as on one occasion[]

stabbed his wife Debra during a drinking binge they were both on. These allegations could not be substantiated." Fell Ex. 320 at 3.

The government asserts that the St. Michael's records were never in its possession. The FBI agent made notes of his review of the St. Michael's records at the school. His notes stated: "Mrs. Sharpe stated that her son-in-law used alcohol regularly. The children were sexually abused; and on one occasion, he stabbed Debra during a drinking binge." Fell Ex. 76 at 46. Although the notes do not explicitly state that Mrs. Sharpe believed that Fell's father sexually abused him, they do imply it. Trial counsel were therefore on notice of a sexual abuse allegation prompting further investigation. Whether the government had and failed to disclose the additional specific information that Fell's grandmother accused her son-in-law of sexually abusing him, depends on extra-record information. Although it seems unlikely that Fell will be able to show that this evidence was suppressed, this portion of the claim may not be summarily dismissed.

Fell also argues that the government failed to disclose evidence related to his receipt of Supplemental Social Security Income ("SSI"). He has not alleged that SSI records were ever in the government's possession, nor has he argued that the Social Security Administration was an "arm of the prosecution."

Consequently this portion of Claim XVII will be dismissed for failure to allege a plausible claim that the government violated an obligation to disclose this information.

### 5.    Claim XVIII

Fell alleges that the government failed to disclose physical evidence that would have supported the claim that Fell and Lee were chronic drug and alcohol abusers, and had used drugs on the night of the crimes.  Specifically, Fell alleges that the government did not disclose or produce for inspection the results of drug testing of a bottle containing brown liquid labeled "Patchouli Tunisian" and a Marlboro cigarette box containing small plastic bags, plus two pipes found in Teresca King's car and an evidence log from the Rutland crime scene.

The FBI's Albany Division office form listing the bottle and the cigarette box indicates a weight of 69.20 grams in the space for "drug weight."  From this information Fell argues that the items were tested for drugs.  The government denies that the items were tested, asserts that the bottle labeled "Patchouli Tunisian" in fact smelled like patchouli, and states that defense counsel reviewed this evidence.  The government's argument, reasonable on its face, nevertheless is not a substitute for proof that the evidence was disclosed and that no tests were performed.

With respect to the pipes, the government elicited testimony

from an Arkansas police officer that the pipes were marijuana
pipes. An FBI form lists the two pipes recovered from the car as
"crack" pipes, and indicates that they will be forwarded to the
FBI in Rutland. Fell Ex. 78. The pipes were not apparently
tested for residue. The government emphasized more than once at
trial that there was no evidence that Fell or Lee had been using
drugs on the night of the crimes.[24]

With respect to the evidence log, the government responds
that there is no reason to suspect a *Brady* violation simply
because no copy of the log was found in trial counsels' files.

The presence of drugs or drug paraphernalia either in the
car or at the Rutland crime scene would have supported Fell's
statements, and allowed trial counsel to argue more persuasively
in mitigation that Fell was impaired. At this point it is
impossible to conclude that Fell has made out a *Brady* violation.

_____

[24]  In its guilt-phase summation, the government stated:
      He said after he was caught and after he was cornered and when he
      was talking about it he said, well, we were all smoking crack that
      night. Another effort to evade the responsibility. He was high
      on crack.
Trial Tr. vol. 4, 69:22-70:1, June 24, 2005.
      In rebuttal the government stated:
      But let's talk for a moment. Mr. Bunin keeps raising this
      question about intoxication and about crack use. Mr. Bunin said
      that. But there's no evidence in this trial of crack use by the
      defendant that night.
*Id.* at 80:5-9.
      In its penalty-phase summation, the government stated:
      Mr. Darrow explained to you that there really was no evidence in
      this case that the defendant was substantially impaired or
      significantly impaired at the time of these crimes. . . . [A
      witness] told you that she was at that apartment at 10 o'clock
      that night. . . . No one was doing drugs. She saw no drug
      paraphernalia.
Trial Tr. vol. 12, 39:9-40:21, July 13, 2005.

As discussed above, however, in section III.A.14, Fell is entitled to discovery on this physical evidence and any testing or other documents relating to it for purposes of his claim that failure to obtain this information and/or to seek independent testing constituted ineffective assistance of counsel. The Court will therefore defer ruling on the *Brady* claim until counsel have had an opportunity to obtain discovery on this issue.

### 6. Claim XIX

Fell also asserts that the cumulative effect of the government's *Brady* violations deprived him of a fair trial. Given that separate claims of withheld evidence will not be summarily dismissed, this claim also withstands summary dismissal.

### 7. Claim XX

This claim asserts that counsel for the government misstated the law, misstated the evidence, and made inflammatory and impermissible remarks in their summations. "In order to prevail on a claim of prosecutorial misconduct, a defendant must demonstrate 'that the prosecutor's remarks were improper and . . . that the remarks, taken in the context of the entire trial resulted in substantial prejudice.'" *United States v. Fell*, 531 F.3d at 221 (quoting *United States v. Bautista*, 23 F.3d 726, 732 (2d Cir. 1994)); *see also United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) ("'Remarks of the prosecutor in summation do

not amount to a denial of due process unless they constitute 'egregious misconduct.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974))).

### a.   Misstating the law

Fell contends that the government repeatedly argued during its penalty-phase summation that the jury should not consider mitigating factors that did not have a connection to the crimes in this case.  This issue was raised and addressed in Fell's motion for new trial, and resolved against him in his direct appeal.  *See Fell*, 531 F.3d at 222-224 & n.14 (finding that the government's comments, whether or not improper, were not prejudicial, given the trial court's instructions).

### b.   Misstating the evidence

During the government's guilt-phase rebuttal the government challenged the defense's references to alcohol consumed by Fell the night Debra Fell and Charles Conway were killed, stating "In fact, there's actually no evidence of him drinking that night other than Mr. Bunin's speculation."  Trial Tr. vol. 4-1, 80:9-11 June 24, 2005.  Fell argues that the record did contain evidence that he had been drinking that night, including  the beer cans strewn around Debra Fell's apartment, Fell's statement that he had been drinking, and the testimony of a witness that Fell and Lee were "spacey" and "not really 100 percent coherent."  *Id.* at 29: 19-21.  He also asserts that there was additional evidence

not admitted at trial but known to the government that showed
that Fell had been drinking that night.

### c. Inflammatory remarks about religious practices

The Second Circuit ruled that evidence about Fell's interest
in Native American and Muslim religious practices was properly
introduced to attempt to rebut the mitigating factor that he had
made positive contributions to the correctional facility.  *Fell*,
531 F.3d at 229-30.  The prosecutor's brief comments in summation
urged the jury to conclude that Fell's interest was feigned and
intended to support the filing of grievances and a lawsuit.

### d. Improper comments upon life in prison

The prosecutor argued in summation:

> Now, let's talk a little bit about justice.  Let's talk
> about right and about wrong.  Donald Fell is continuing
> to live his life, and he wants to continue to live his
> life, and he wants those things in prison.  He likes
> his cup of coffee.  He likes those three square meals a
> day.  Terry King died with a mouthful of blood.  That
> is wrong.  Donald Fell's about 25.  He goes to prison
> for life.  He will live another 50 years or so.  And
> those will be years with three meals a day, with that
> cup of coffee that he didn't want to put down, with
> rec. facilities, access to a gym, access to books in a
> library, phone privileges, correspondence, mail, game
> tables, letters, holidays, birthdays. . . . Those 50
> years that Donald Fell would have in prison, he doesn't
> deserve them.  Life in prison is a diminished life, no
> doubt, but it is life.  You find things that you care
> about, and you treasure:  A cup of coffee, a good book,
> some exercise, a sunny day in the yard, shooting hoop
> with your buddies.  Those things are important to you.
> He doesn't deserve 50 years of those things after what
> he did.

Trial Tr. vol. 12, 129:2-130:10, July 13, 2005.  Such comments,

as one court put it, "cannot be condoned." *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) (quoting *Duckett v. State*, 919 P.2d 7, 19 (Okla. Crim. App. 1995)); *accord Le v. Mullin*, 311 F.3d 1002, 1014-15 (10th Cir. 2002); *cf. Hall v. Catoe*, 601 S.E.2d 335, 341 (S.C. 2004) (comparison of victim's life to defendant's life was impermissibly inflammatory). *But see United States v. Higgs*, 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that life imprisonment would be soft on the defendant).

The government contends these comments either were not error or did not cause Fell prejudice, or that Fell's failure to raise the issue at trial or on direct appeal forecloses raising it here. Fell has alleged that ineffective assistance of counsel excuses any procedural default, and that prejudice must be evaluated based on the entirety of his claims of prosecutorial misconduct. His claim that the government's conduct in summation as a whole deprived him of a fair trial cannot be summarily dismissed; however, given that the Second Circuit found no error in the admission of testimony about Fell's interest in various religious practices while incarcerated, the prosecutor's comments on this evidence are dismissed from this claim.

### 8. Claim XXI

Fell claims that the cumulative effect of the government's misconduct in this case so infected the trial as to render it

105

fundamentally unfair.  He argues that statements by the
government during both guilt and penalty phase summations,
multiple instances of eliciting false or misleading testimony,
numerous *Brady* violations, and violation of this Court's order
regarding mental health testing was egregious and deprived Fell
of his constitutional rights.

Although not every error, even in combination, warrants a
new trial, *see Fell*, 531 F.3d at 233, the cumulative effect of
alleged multiple instances of prosecutorial misconduct presents a
plausible non-frivolous claim  that does not warrant summary
dismissal.

C.   **Other Claims**

1.   **The Attorney General's Decision to Seek the Death
Penalty**

Fell claims that the Department of Justice ("DOJ"), through
then-United States Attorney General John Ashcroft, decided to
seek the death penalty against him on the basis of race, gender
and geography, in violation of the Fifth, Sixth and Eighth
Amendments.[25]  Fell's race-based argument is essentially a claim
of selective prosecution.  Prosecutorial decisions enjoy a
"'presumption of regularity,'" and "'in the absence of clear
evidence to the contrary, courts presume that they have properly

---

[25]  This claim was not raised at trial or on appeal.  As
cause for his double procedural default, Fell asserts that trial
and appellate counsel were constitutionally ineffective.

discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)).  The broad discretion over decisions whether or not to prosecute or what charges to file or bring before a grand jury "is 'subject to constitutional constraints,'" *id.* (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)), however, including the equal protection clause's requirement that the decision not be based on an arbitrary classification such as race.

To establish a selective death penalty prosecution claim, Fell must show that the DOJ did not seek the death penalty against similarly situated individuals of a different race.  His § 2255 motion does not make such an allegation.  Fell believes that in 2001 Attorney General Ashcroft advocated a wider use of the federal death penalty, seeking to refute statistical studies reflecting racial disparities in its application.  In June 2001 the DOJ revised its death penalty protocol to require that the Attorney General approve any plea agreement that reduced a capital-eligible offense.  Fell's contention is that his plea agreement was rejected because he was white, but he does not argue that non-whites' plea agreements to non-capital offenses were accepted, or that similarly situated non-white defendants were not served with a notice of intent to seek the death penalty.  In fact, Fell's claim is that he is the victim of an

arguably more inclusive death penalty policy, in effect a claim
of inclusive prosecution.

At the outset, therefore, Fell does not state a claim for
selective prosecution, much less one that is plausible.  However,
were the Court to recognize that a claim of selective prosecution
can be based on the rejection of a plea agreement and to conclude
that Fell passed this threshold requirement, and to go on to
consider whether he was entitled to obtain discovery in support
of his claim, Fell would have to meet a "rigorous standard."  *Id.*
at 468.  In order to obtain discovery, Fell must show "some
evidence tending to show the existence of discriminatory effect
and discriminatory intent."  *Id.*  To show the existence of
discriminatory effect he must make a "credible showing of
different treatment of similarly situated persons."  *Id.* at 470;
*accord United States v. Bass*, 536 U.S. 862, 864 (2002) (per
curiam).

Fell's citation of news articles about racial bias in the
application of the federal death penalty, and statistical studies
suggesting that the death penalty was sought and imposed
disproportionately against black defendants, does not supply the
requisite showing that non-white individuals, similarly situated,
were not singled out for the treatment he received.  *See*
*Armstrong*, 517 U.S. at 470.

Fell has also made an Eighth Amendment argument that the

108

timing of the plea negotiations in his case, coinciding with the release of the DOJ's revised death penalty protocol that deprived local United States Attorneys of the power to approve plea agreements in capital cases, rendered the sentence of death against him cruel and unusual. Although it is true "that the Eighth Amendment requires that a sentence of death not be imposed arbitrarily," *Jones v. United States*, 527 U.S. 373, 381 (1999), Fell has not demonstrated a connection between the Attorney General's decision to reject a plea agreement to life without the possibility of release and the jury's decision, after weighing aggravating and mitigating factors, to vote for a sentence of death.

Accordingly, Fell's race-based claim that the Attorney General's decision to seek the death penalty violated his constitutional rights is dismissed.

Fell also claims that the Attorney General's decision to seek the death penalty against him was based on his status as a defendant in the District of Vermont, and contends that this violated his Sixth and Eighth Amendment rights. He alleges that the Attorney General was determined to nationalize the use of the federal death penalty and to focus on states such as Vermont, which does not have a death penalty. This claim, like Fell's race-based claim, fails to state a claim and fails to support his request for discovery, and is dismissed.

Fell also claims that the Attorney General's decision to seek the death penalty against him was based on the race and gender of the victim, and therefore violated his Fifth, Sixth and Eighth Amendment rights.  As with Fell's other claims, "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'"  *Armstrong*, 517 U.S. at 465 (quoting *Chem. Found.*, 272 U.S. at 14-15).  In order to establish entitlement to discovery, Fell must produce "some evidence" that the death penalty could have been–but was not–sought against similarly situated defendants whose victims were black.

Fell's evidence of differential treatment consists of the allegation that the DOJ seeks the death penalty in a disproportionately larger share of cases in which the victim was white and/or female.  Statistics or studies that do not identify similarly situated individuals who were differently treated do not constitute "some evidence."  *Id.* at 470; *accord Bass*, 536 U.S. at 863-64; *United States v. Alameh*, 341 F.3d 167, 172 n.2 (2d Cir. 2003).  This claim is dismissed as well.

    2.    **Whether Fell was Developmentally a Juvenile and Whether His Execution Would Violate the Eighth Amendment**

The United States Supreme Court examines the nation's "evolving standards of decency" to determine whether applying a particular punishment to a particular category of offender is

110

cruel and unusual punishment within the meaning of the Eighth

Amendment. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 561

(2005); *Thompson v. Oklahoma*, 487 U.S. 815, 821 (1988). "Because

the death penalty is the most severe punishment, . . . [c]apital

punishment must be limited to those offenders who commit 'a

narrow category of the most serious crimes' and whose extreme

culpability makes them 'the most deserving of execution.'"

*Roper*, 543 U.S. at 568 (quoting *Atkins v. Virginia*, 536 U.S. 304,

319 (2002)). Where once the Court drew the line between the

executable and the non-executable offender at age 16, *see*

*Thompson*, 487 U.S. at 838, it more recently concluded "that the

death penalty is disproportionate punishment for offenders under

18." *Roper*, 543 U.S. at 575.

The Court acknowledged that drawing the line at any

particular age does not address the reality that "[t]he qualities

that distinguish juveniles from adults do not disappear when an

individual turns 18," or that some juveniles may be considerably

more mature than many adults. *Id.* at 574. Regardless, "[t]he

age of 18 is . . . the age at which the line for death

eligibility . . . rest[s]." *Id.* Current Supreme Court precedent

therefore prevents this Court from moving that line, or

transforming it into a set of developmental factors.

As the Supreme Court has noted, death penalty sentencing is

designed to consider the mitigating factor of youth in every

case.  *Id.* at 572.  In this case, the jury was required to
consider the mitigating factor of Fell's youth.  Whether trial
counsel adequately presented as mitigation that Fell was
functionally a juvenile, based on his home environment, genetic
factors and chronic drug and alcohol abuse, remains at issue in
this case.  However Fell fails to state a plausible claim that he
is categorically ineligible for the death penalty on the ground
that, despite being older than 18 at the time he committed his
crimes, he was still functionally a juvenile.

### 3.    Whether the manner in which the government would execute Fell violates the Eighth Amendment

Lastly, Fell claims that it is likely that the government
will use the currently predominant method of execution—by lethal
injection—to execute him.  He posits that the government may
attempt to use imported and unregulated sodium thiopental, one of
the drugs used for lethal injection, and that its use would very
likely cause him serious injury and needless suffering.  At
sentencing on June 16, 2006, the Court provisionally designated
Indiana as the state whose law will govern the implementation of
Fell's sentence, pursuant to 18 U.S.C. § 3596(a).  Sentencing Tr.
4:9-16, June 16, 2006.  Both Indiana and federal law provide for
execution by lethal injection.  *See* 28 C.F.R. § 26.1-26.3.  The
government argues that this issue is not ripe, and Fell does not
disagree.

Assuming for the sake of argument that this issue may be

raised in a § 2255 petition,[26] the issue is not ripe.  In order to prevail on a challenge to an execution method, a petitioner must show a substantial risk of serious harm.  *Baze v. Rees*, 553 U.S. 35, 52 (2008) (plurality op.).  "[T]o prevail on a claim that a risk of future harm runs afoul of the Constitution, an inmate must demonstrate that the conditions presenting the risk must be *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers."  *Jackson v. Danberg*, 656 F.3d 157, 161 (3d Cir. 2011) (quotation marks and citation omitted); *see also Baze*, 553 U.S. at 50.  Neither party has provided the Court with a current execution protocol.  The current execution protocol may not be in effect when Fell's § 2255 motion is resolved.  *See, e.g.*, *Jackson*, 656 F.3d at 164 (noting that several states have recently substituted the use of pentobarbital in lieu of sodium thiopental in their protocols).  It is of course possible that the resolution of Fell's § 2255 motion may moot this issue.

Accordingly, the Court dismisses without prejudice Fell's Eighth Amendment claim regarding the manner of his execution.

---

[26]  *See Hill v. McDonough*, 547 U.S. 573 (2006) (holding that a prisoner's suit alleging a constitutional violation with respect to method of execution may proceed under 42 U.S.C. § 1983); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009) (holding that a § 1983 lawsuit is the proper way to challenge lethal injection procedures, relying on *Hill*). *But see Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) (holding that a method-of-execution challenge may be cognizable in a habeas action).

**III. Conclusion**

For the reasons stated above, the Court **grants in part and denies in part** the government's request for summary dismissal. Portions of Fell's Claim XIV, Claim XV, Claim XVII, Claim XX and Claims XXIII.A, C and D are summarily dismissed.  Fell's Claim XXIII.E is dismissed without prejudice.  Within thirty days of the filing of this order the parties will submit for the Court's approval a discovery plan with respect to the remaining ineffective assistance of counsel and prosecutorial misconduct claims.  Claim XXII is addressed in a separate memorandum opinion and order.

Dated at Burlington, Vermont, this 10th day of May, 2013.

/s/ William K. Sessions III
William K. Sessions III
District Judge